**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK JAMES and EDWARD JAMES,<br><br>      Defendants. | Case No.: 1:26-CR-29 (AT) |

**DEFENDANT EDWARD JAMES'**
**MOTION FOR BILL OF PARTICULARS**

BRACEWELL LLP
31 West 52nd Street
Suite 1900
New York, New York 10019
(212) 508-6100

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...........................................................................................................4

    I.     The Alleged Schemes ...............................................................................5

    II.    The Government's Inadequate Responses To Mr. James' Prior Request
          For Additional Information.........................................................................8

LEGAL STANDARD.....................................................................................................9

ARGUMENT ...............................................................................................................11

    I.     Arguments Made By Patrick James Apply Equally To Edward James.................11

    II.    The Government Should Describe Mr. James' Role .............................................17

    III.   The Government Should Provide Particulars Of The Money Laundering
           Charge ...................................................................................................19

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartell v. U.S.*,
227 U.S. 427 (1913)..................................................................................................9

*Cole v. State of Ark.*,
333 U.S. 196 (1948)..................................................................................................9

*In re Terrorist Bombings of U.S. Embassies in E. Africa*,
552 F.3d 93 (2d Cir. 2008)......................................................................................18

*United States v. Barnes*,
158 F.3d 662 (2d Cir. 1998)....................................................................................10

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000).......................................................................11

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987)..........................................................................10, 14, 16

*United States v. Carona*,
No. 06-CR-224-AG, 2008 WL 1970199 (C.D. Cal. May 2, 2008) .........................18

*United States v. Dames*,
380 F. Supp. 2d 270 (S.D.N.Y. 2005).......................................................................9

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988)............................................................................18, 19

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987)........................................................................10

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) ...............................................................11, 17

*United States v. Leon*,
No. 08-CR-65, 2008 WL 4966904 (D. Vt. Nov. 18, 2008)....................................20

*United States v. Lino*,
No. 00-CR-632-WHP, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ......................11, 12

*United States v. Mannino*,
480 F. Supp. 1182 (S.D.N.Y. 1979)........................................................................12

*United States v. Murgio,*
   209 F. Supp. 3d 698 (S.D.N.Y. 2016)......................................................................18

*United States v. Orena,*
   32 F.3d 704 (2d Cir. 1994).....................................................................................13

*United States v. Pinto-Thomaz,*
   352 F. Supp. 3d 287 (S.D.N.Y. 2018).....................................................................12

*United States v. Reddy,*
   190 F. Supp. 2d 558 (S.D.N.Y. 2002).....................................................................10

*United States v. Rinsch,*
   807 F. Supp. 3d 238 (S.D.N.Y. 2025).....................................................................16

*United States v. Tournant,*
   No. 22-CR-276-LTS, 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023)..................10, 13

*United States v. Vaid,*
   No. 16-CR-763-LGS, 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017).......................16

*United States v. Wang,*
   No. 23-CR-118-3-AT, 2024 WL 1251105 (S.D.N.Y. Mar. 22, 2024) ............10, 13, 17, 19, 20

**Statutes**

18 U.S.C. § 20...........................................................................................................12

18 U.S.C. § 225...........................................................................................................4

18 U.S.C. § 1343..........................................................................................................4

18 U.S.C. § 1344..........................................................................................................4

18 U.S.C. § 1349..........................................................................................................4

18 U.S.C. § 1956(h) .....................................................................................................4

**Rules**

Federal Rules of Criminal Procedure Rule 7(f) ..........................................................9

Local Criminal Rule 16.1.............................................................................................9

**PRELIMINARY STATEMENT**

This case presents a striking example of an indictment that gestures broadly at complex financial wrongdoing while withholding the factual specificity that due process demands. The government has charged Edward James ("Mr. James") with participating in four interlocking fraud schemes allegedly spanning nearly a decade, filed a nine-count indictment running dozens of paragraphs, and produced millions of documents from more than 130 entities, yet has never told Mr. James who he supposedly defrauded, which specific statements he supposedly made or approved, or precisely what role he played in any of the charged conduct. These gaps are precisely what a bill of particulars is intended to cure.

The Indictment purports to charge Mr. James in connection with four schemes: (i) an accounts receivable fraud in which First Brands Group, LLC ("First Brands") employees submitted fictitious, inflated, or double-pledged invoices to factoring counterparties; (ii) an accounts payable fraud in which First Brands submitted false information to supply-chain financers to induce increased advances; (iii) an off-balance-sheet debt scheme in which co-defendant Patrick James-affiliated entities obtained financing from "Off-Sheet Lenders" in transactions allegedly designed to conceal the true extent of First Brands' liabilities; and (iv) a false-financial-statements scheme in which First Brands allegedly provided inaccurate financial information and misrepresented collateral to its asset-backed lenders. Woven through each scheme is the threadbare allegation that the misconduct occurred "[a]t the direction and with the approval of" Mr. James.

The Indictment does not identify a single document Mr. James reviewed or approved. It does not name a single lender or financial institution he dealt with, deceived, or even communicated with. It does not describe a single false statement he made or authorized. It does not specify any counterparty to whom he made a representation, any transaction he directed, or

any specific act he personally undertook to advance any scheme. And with limited exception, it does not allege that Mr. James knew the conduct underlying any scheme was fraudulent.

The deficiencies run deeper than Mr. James' role. Although the government charges a sweeping multi-year conspiracy and repeatedly invokes the collective conduct of unnamed "First Brands employees" and other unidentified co-conspirators, the defense is left to guess who they are. Beyond Patrick James, the Indictment does not name a single person alleged to have conspired with Mr. James or describe any individual's role in the charged conduct. In a case built on the theory that Mr. James directed and approved the conduct of others, the identity of those others is essential to preparing a response to the government's account at trial, and the risk of unfair surprise is high.

The Indictment also fails to identify the victims. The alleged defrauded parties are described only through shifting and largely undefined categories like "lenders and financing partners," "factoring partners," "Off-Sheet Lenders," "asset-backed lenders," "senior lenders," and "creditors, auditors, and potential purchasers," with little indication of which financial institutions fall within each category or which counts are directed at which lenders.

The Indictment similarly fails to identify the false statements underlying any scheme. For the accounts receivable fraud, the government alleges that unspecified "First Brands employees" submitted fraudulent invoices but never identifies which invoices, to whom, in what amounts, or on what dates. For the accounts payable fraud, the government asserts that "First Brands" submitted false invoice information and misrepresented its financial position but names no specific invoices, transactions, or communications. For the off-balance-sheet scheme, the Indictment alleges "false and misleading representations" to Off-Sheet Lenders to induce financing, but does not identify the particular representations, who made them, or when. For the false-financial-

statements scheme, the Indictment points to a single example of making "fraudulent adjustments to First Brands' financials, at the direction of PATRICK JAMES," and little more. Across the entire Indictment, the government has not identified a single specific misrepresentation made or approved by Edward James.

These deficiencies are only exacerbated, not cured, by the government's voluminous discovery productions. Beyond the sheer volume of documents produced, just one spreadsheet identified by the government in lieu of particulars regarding false invoices contains multiple worksheets with over 2.6 million rows of transactional data. It contains no indication of which entries the government contends were fraudulent, which were approved by Mr. James, or how the defense would begin to distinguish legitimate transactions from the charged ones. The Second Circuit has made clear that the government cannot satisfy its constitutional obligations by drowning the defense in documents and leaving counsel to guess which transactions were improper, and that when it does so the need for a bill of particulars is greater.

Accordingly, Mr. James respectfully requests that this Court order the government to provide a bill of particulars identifying: (1) each co-conspirator alleged to have acted with Mr. James; (2) each financial institution, lender, and victim allegedly affected or defrauded under each charged count; (3) the specific invoices, transactions, and false financial statements that Mr. James allegedly directed or approved; (4) the nature and extent of Mr. James' role in the alleged schemes; and (5) the specific transactions, entities, and accounts underlying the money laundering conspiracy charged in Count Nine. Each of these categories goes to the core of the charged offenses and is essential to Mr. James' ability to prepare a defense, avoid surprise, and secure the fair trial to which he is constitutionally entitled.

**BACKGROUND**

On January 29, 2026, this Court unsealed a nine-count indictment against Patrick James and Edward James, charging each defendant with (1) conspiracy to commit wire fraud affecting a financial institution and bank fraud, in violation of 18 U.S.C. § 1349 (Count Two); (2) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343 (Counts Three, Four, Six, and Eight); (3) bank fraud, in violation of 18 U.S.C. § 1344 (Counts Five and Seven); and (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine). Patrick James was additionally charged with organizing, managing, and supervising a continuing financial crimes enterprise, in violation of 18 U.S.C. § 225 (Count One).

As set out in the Indictment, Mr. James is a former executive of First Brands, which was a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, and other products. *See* Indictment ¶¶ 4-6.  Founded in 2013, First Brands served large automotive retailers, wholesale part distributors, and the world's largest commercial retailers, ultimately generating billions in annual sales until filing for Chapter 11 bankruptcy protection in September 2025. *See id.* ¶¶ 3-4.

The Indictment alleges that First Brands defrauded its lenders and financers through four amorphously pleaded schemes perpetrated at the direction of Patrick James—First Brands' founder and Chief Executive Officer—Mr. James, and their unnamed co-conspirators.[1] While the government purports to detail a wide-ranging fraud spanning from 2018 until September 2025, the Indictment never identifies the actors, the victims, or the purportedly false statements underlying the alleged schemes. The government's allegations of Mr. James' conduct are particularly sparse

---

[1] Mr. James does not concede any of the Indictment's allegations.

and conclusory. The Indictment does little more than generically allege misconduct by First Brands, tacking on that these actions were taken at Mr. James' "direction" and with his "approval."

## I.    The Alleged Schemes

The four separate schemes alleged in the Indictment involve: (i) accounts receivable financing, (ii) accounts payable financing, (iii) off-balance-sheet debt, and (iv) false statements regarding First Brands' financial condition.

The alleged accounts receivable fraud concerns First Brands' use of factoring, "a financing arrangement in which a business typically sells or assigns its accounts receivable (invoices) to a third party—commonly a bank or specialized finance company—in exchange for near-term cash, typically at a discount." Indictment ¶ 8. The Indictment refers to the third parties that provided such financing to First Brands interchangeably as, among other things, "factors," "factoring partners," and "lenders." *Id.* ¶¶ 8, 12, 13. According to the Indictment, this scheme consisted of unnamed "First Brands employees routinely submit[ting] fake invoices, fraudulently inflated invoices, and double-pledged invoices for the purpose of selling and pledging them to factoring counterparties as if they represented valid, collectible receivables from customers." *Id.* ¶ 12.

The *only* allegation regarding Mr. James' role or participation in this fraud is that First Brands obtained this financing from factors "[a]t the direction and with the approval of" Mr. James. *Id.* Further left unstated in the Indictment are who submitted the allegedly fraudulent invoices, who received these submissions and when, and what false statements underlie these allegations. *See id.* ¶¶ 12-15.

The accounts payable financing fraud concerns First Brands' use of supply-chain financing, an arrangement under which "financial institutions advanced funds against invoices First Brands owed to its suppliers." *Id.* ¶ 9. The Indictment variously refers to these financial institutions as "financers," "lenders," "accounts payable factoring partners," "supply-chain

financers," and "factor[s]." *Id.* ¶¶ 9, 16, 17, 19-20. According to the government, "First Brands submitted false and misleading invoice information and false and misleading information about First Brands' financial position to induce [these] financers to increase the amount of funds advanced." *Id.* ¶ 16.

The Indictment identifies the perpetrator of the accounts payable scheme as "First Brands" itself. *Id.* ¶¶ 16 ("First Brands … defrauded its accounts payable factoring partners."), 17 ("First Brands fabricated the amounts it purportedly owed to suppliers."). The Indictment does not say what misrepresentations were made in furtherance of this scheme, who made these misrepresentations, who received them, or when. And the only allegations regarding Mr. James' role are that First Brands undertook these actions "[a]t the direction and with the approval" of Mr. James, along with the allegation that Mr. James "closely monitored and managed" the transactions. *Id.* ¶¶ 16, 18.

The off-balance-sheet-debt scheme involved the alleged concealment of debt incurred through inventory financing. *See id.* ¶ 21. The Indictment alleges that certain "James Entities," "wholly owned and controlled by PATRICK JAMES," entered into financial arrangements "with at least three inventory financers," referred to as the "Off-Sheet Lenders." *Id.* ¶ 22. The Off-Sheet Lenders are alleged to have "advanced funds to the James Entities, which purportedly used those funds to purchase inventory from First Brands, which was pledged back to the Off-Sheet Lenders as collateral." *Id.* ¶ 22. In other cases, "the James Entities entered sale-leaseback transactions, purportedly purchasing inventory from First Brands, selling it to Off-Sheet Lenders, and then leasing back the inventory to the James Entities—funneling the cash from the Off-Sheet Lenders to First Brands." *Id.* The Indictment alleges that these activities defrauded, first, "First Brands' senior lenders" by concealing the off-balance-sheet financing, and second, the Off-Sheet-Lenders

through "false and misleading representations … to fraudulently induce them to extend and expand financing." *Id.* ¶¶ 24-25.  The Indictment further alleges an effort to "disguise both the source of proceeds obtained from the Off-Sheet Lenders and flowing into First Brands and the repayment of obligations from First Brands to the Off-Sheet Lenders." *Id.* ¶ 26.

Once again, the Indictment leaves Mr. James' alleged misconduct largely unexplained. The Indictment alleges that Mr. James "negotiated" "[t]he financing arrangements with the Off-Sheet Lenders," *id.* ¶ 23—arrangements that the Indictment does not allege were improper in and of themselves—and that the allegedly obfuscatory flow of funds was implemented at Mr. James' "direction," *id.* ¶¶ 25, 28. The Indictment also vaguely asserts that Mr. James "purported" inventory to be unencumbered when it was not, and that the defendants "caused fake inventory schedules to be provided." *Id.* ¶ 25. Nor is anyone else's role made clear. The Indictment contains no allegations regarding when or how the alleged misrepresentations underlying the scheme were made, outside of a single alleged representation by "one of First Brands' senior executives" allegedly made "at the direction of PATRICK JAMES." *Id.* ¶ 24. As to the alleged victims of this scheme, the Indictment never explains who First Brands' "senior lenders" are meant to encompass, and despite characterizing this alleged scheme as a "Fraud on First Brands' Senior Lenders," the Indictment elsewhere describes it as an effort directed generally towards "the company's lenders" or, broader still, its "lenders and other stakeholders." *Id.* ¶¶ 9, 21, 28, 29.

Finally, the government alleges a scheme concerning First Brands "disseminating materially false and misleading financial information about the company and secretly encumbering assets subject to the lenders' borrowing base and priority liens." *Id.* ¶ 30. This scheme encompassed First Brands providing its "asset-backed lenders" with inaccurate financial

statements and false and misleading information regarding the collateral allegedly securing their loans. *Id.* ¶¶ 31, 33.

As to Mr. James, the Indictment again alleges only that he "caused" inaccurate information to be provided. *Id.* ¶¶ 31, 33. Again, allegations regarding alleged victims are non-specific. The "asset-backed lenders" are identified only as any number of "lenders" from which First Brands "borrowed billions of dollars … secured by inventory and other physical assets such as manufacturing plants, equipment, and other fixed assets." *Id.* ¶ 10. And other than referencing a single example of "fraudulent adjustments to First Brands' financials," made "at the direction of PATRICK JAMES," the Indictment contains no allegations regarding what particular false representations were made, when they were made, or by whom.

The Indictment's generic and inconsistent recitation of the facts carries through to the statutory allegations for the counts in which Mr. James is charged. For example, at Count 7, the Indictment charges Mr. James with bank fraud in connection with an alleged scheme to "defraud financial institutions that provided asset-backed financing to First Brands," with no indication of whether these financial institutions include the "senior lenders," the Off-Sheet Lenders alleged to have provided financing backed by First Brands' inventory, or a combination of the two. *Id.* ¶ 51.

## II.    The Government's Inadequate Responses To Mr. James' Prior Request For Additional Information

On April 8, 2026, Mr. James requested a bill of particulars identifying the employees, auditors, lenders, financial institutions, and other counterparties referenced in the Indictment; the dates, participants, and methods of alleged communications, negotiations, and financing transactions; and the specific conduct attributed to Mr. James, including whom he allegedly communicated with, directed, or negotiated with, and how. *See* Declaration of Seth D. DuCharme,

dated July 31, 2026 ("DuCharme Decl."), Ex. A at 2-3. This request incorporated Patrick James'

March 18, 2026 request for a bill of particulars by reference. *See* DuCharme Decl., Ex. B.

On May 14, 2026, the government responded to Mr. James' April 8 letter. *See* DuCharme

Decl., Ex. C. This letter incorporated the government's April 3, 2026 response to Patrick James'

request by reference. *See* DuCharme Decl., Ex. D. The government's May 14 disclosures to Mr.

James were limited and incomplete, identifying only a narrow subset of financial institutions and

entities involved in lender negotiations and inventory-financing arrangements. *See* DuCharme

Decl., Ex. C at 2-3. The response did little to clarify the charges against Mr. James or to identify

the conduct the government intends to prove at trial.[2]

## LEGAL STANDARD

"No principle of procedural due process is more clearly established than that notice of the

specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired,

are among the constitutional rights of every accused in a criminal proceeding in all courts, state or

federal." *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948); *see also Bartell v. U.S.*, 227 U.S. 427,

431 (1913) ("It is elementary that an indictment, in order to be good under the Federal Constitution

and laws, shall advise the accused of the nature and cause of the accusation against him, in order

that he may meet the accusation and prepare for his trial . . . .").

Rule 7(f) of the Federal Rules of Criminal Procedure safeguards these constitutional rights

by permitting "'a defendant to seek a bill of particulars in order to identify with sufficient

particularity the nature of the charge pending against him, thereby enabling defendant to prepare

for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a

second time for the same offense.'" *United States v. Dames*, 380 F. Supp. 2d 270, 273 (S.D.N.Y.

---

[2] This pre-motion effort to resolve the issues raised by this motion satisfies Local Criminal Rule 16.1. *See* DuCharme Decl. ¶¶ 2-6.

2005) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)). A bill of particulars is warranted where the indictment is "insufficient on its face to provide the defendant with sufficient detail to defend adequately the charges against him," *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998), or "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused," *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). Moreover, this Court has recognized that "[i]n complex conspiracy cases like this one, the potential for unfair surprise and the difficulty of preparing a defense are amplified." *United States v. Wang*, No. 23-CR-118-3-AT, 2024 WL 1251105, at *5 (S.D.N.Y. Mar. 22, 2024).

"[F]actors that have been found relevant to determining whether particulars are necessary include: the clarity of the indictment; the duration and breadth of the alleged conspiracy, *i.e.*, the complexity of the crime charged; whether the government has provided adequate notice of the particulars; the potential danger to co-conspirators, witnesses, or victims; and the nature of the alleged criminal conduct." *United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 8649893, at *2 (S.D.N.Y. Dec. 13, 2023) (collecting cases). As set forth below, these factors weigh in favor of granting Mr. James' request for a bill of particulars.

In circumstances like those presented here, "the Second Circuit has made clear that the Government does 'not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided' as to the nature of the charges pending." *United States v. Reddy*, 190 F. Supp. 2d 558, 565 (S.D.N.Y. 2002) (quoting *Bortnovsky*, 820 F.2d at 575). Put differently by this Court, when opposing a motion for a bill of particulars, the government "cannot rely on discovery where, as here, the large volume of material disclosed forces the defendant to attempt to guess at which transactions . . . were allegedly improper." *Wang*, 2024 WL 1251105, at

*5 (citation modified). Rather, "sometimes, *the large volume of material disclosed is precisely what necessitates a bill of particulars*." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (emphasis added).

**ARGUMENT**

**I.      Arguments Made By Patrick James Apply Equally To Edward James**

Mr. James respectfully joins in, and incorporates by reference, the arguments made in support of Patrick James' Motion for a Bill of Particulars, dated July 18, 2026 (Dkt. No. 85) ("Patrick James Motion"). Each argument in the Patrick James Motion applies equally to Mr. James. *See, e.g.*, *United States v. Lino*, No. 00-CR-632-WHP, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) ("This Court's rulings on [defendants' separate motions for bills of particulars] shall inure to the benefit of similarly situated defendants where appropriate.").

***Identities of Co-Conspirators*:** Although Mr. James is not charged under Count One, his need for the identification of the co-conspirators described therein is equally acute. Count One comprises the entirety of the "speaking" portion of the Indictment, and purports to describe the four alleged schemes that involved Mr. James. Moreover, Counts Two and Nine, alleging conspiracies to commit wire fraud and money laundering, refer to Mr. James having conspired with others "known and unknown," Indictment ¶¶ 40, 56, and each of Counts Three through Eight allege schemes devised or executed by Patrick James, Mr. James, "and others." *Id.* ¶¶ 43, 45, 47, 49, 51, 53.

Nowhere, however, does the government explain who is alleged to have acted with Mr. James, leaving him unable to prepare his defense. In a case like this, involving complex fraud charges, such information is essential for the defendant to avoid unfair surprise, especially where "the acts which form the basis of the charges may outwardly appear to be legitimate business communications." *United States v. Kahale*, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009)

-11-

(recognizing a "concomitant greater need to identify with some particularity the 'others' who are referred to in the Indictment").

Accordingly, Mr. James is entitled to a bill of particulars identifying the alleged co-conspirators. *See, e.g.*, *Lino*, 2001 WL 8356, at \*13 (observing that "[d]isclosure of the names of co-conspirators well in advance of trial will facilitate defendants' trial preparation and allow them to narrow, or at least to prioritize, their review of [trial evidence] and to avoid surprise at trial" and "direct[ing] the Government to file a bill of particulars identifying all co-conspirators and co-schemers who either will be called to testify, or be referred to, at trial"); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018) (recognizing that the risk of surprise to a defendant is "enhanced if there are a large number of co-conspirators and a long running conspiracy" and granting motion as to the identities of unindicted co-conspirators) (internal quotation marks omitted); *United States v. Mannino*, 480 F. Supp. 1182, 1185 (S.D.N.Y. 1979) (granting bill of particulars for names of co-conspirators known to the government).

***Victims and financial institutions***: The government must also identify the victims and financial institutions allegedly affected or defrauded by the charged conduct. Counts Two through Eight require the government to demonstrate that the alleged schemes "affected" or "defrauded" a "financial institution," (as defined by 18 U.S.C. § 20), yet the Indictment identifies no such institution. Instead, the Indictment relies upon ambiguous, undefined categories of "lenders and financing partners," "factoring partners," "inventory financers," and "creditors, auditors, and potential purchasers." Indictment ¶¶ 2, 22, 34. The identities of these alleged victims and financial institutions are central to Mr. James' ability to prepare a defense.

The Indictment alleges that Mr. James personally negotiated financing arrangements with First Brands' lenders, placing the specific counterparties at the heart of the government's theory

of liability. *See* Indictment ¶ 23. Courts have repeatedly recognized that a bill of particulars is warranted where identification of the allegedly defrauded victims and entities is necessary to permit meaningful trial preparation. *See United States v. Orena*, 32 F.3d 704, 714-15 (2d Cir. 1994); *Wang*, 2024 WL 1251105, at *5; *Tournant*, 2023 WL 8649893, at *4.

The government's limited disclosures do not remedy this deficiency. In its April 3, 2026 letter to Patrick James, which was incorporated into its May 14, 2026 response to Mr. James, the government identified 11 financial institutions but expressly characterized that disclosure as "non-exhaustive" and reserved the right to rely on additional entities at trial. *See* DuCharme Decl., Ex. D at 1. Such a qualified disclosure provides no meaningful notice of the institutions the government contends were affected or defrauded, especially where the government has produced extensive documents from more than 130 parties, including numerous financial institutions *not* listed in the government's letter.

As this Court recognized in *Wang*, identifying only a subset of entities implicated in a complex financial scheme does not provide adequate notice of the institutions at issue. *See* 2024 WL 1251105, at *5. Without an identification of the financial institutions underlying the charged offenses, Mr. James cannot reasonably assess the scope of the government's allegations, prepare a defense to an essential element of the fraud counts, or avoid unfair surprise at trial.

The same principles apply to the government's failure to identify other alleged victims and counterparties. The Indictment broadly describes the victims of the alleged schemes as "lenders and financing partners," Indictment ¶ 2; "factoring partners," *id.* ¶ 12; "inventory financers," *id.* ¶ 22; and "creditors, auditors, and potential purchasers," *id.* ¶ 34. The government's April 3, 2026 letter identifies a limited number of counterparties and directs Mr. James to look to the discovery productions for additional detail regarding how the alleged frauds harmed others. *See* DuCharme

-13-

Decl., Ex. D at 2. However, as mentioned above, discovery encompasses numerous counterparties with whom First Brands and its personnel interacted, all potential "victims" of the charged schemes. Because neither the Indictment nor the discovery permits Mr. James to determine which entities constitute the alleged victims of the charged schemes, a bill of particulars is necessary to define the contours of the government's case and ensure the fair opportunity to prepare a defense that due process requires.

*False statements*: The government should be required to identify the invoices, transactions, false financial statements, and other false or materially misleading statements it contends Mr. James directed or approved.

The Indictment alleges that fraudulent invoices were submitted "[a]t the direction and with the approval" of both defendants, but it fails to identify which invoice submissions Mr. James allegedly directed or approved. *See*, *e.g.*, Indictment ¶¶ 12, 16. This omission is significant because the government's proof of knowledge and intent necessarily depends on the specific transactions at issue. Whether a given invoice was legitimate, duplicated, or inflated can be assessed only by considering its underlying facts and surrounding circumstances. Without knowing which transactions form the basis of the charges, Mr. James cannot meaningfully investigate the facts, identify witnesses, or prepare defenses relating to intent, knowledge, and materiality.

The government cannot cure this deficiency (or any other particulars sought by this motion) by directing the defense to the discovery produced thus far. By any measure the government has provided "mountains" of documents like those described by the court in *Bortnovsky* and has left the defense "unguided as to which documents would be proven falsified . . . ." *Bortnovsky*, 820 F.2d at 575. To date, it has produced more than 4.6 million documents, comprising at least 18.9 million pages spanning nearly a decade. These materials come from no fewer than 130 entities,

-14-

and among those entities thousands of individuals. This discovery deluge, with no indication as to what is relevant to the charged conduct and what is not, underscores the need for a bill of particulars.

The government also cannot satisfy its obligation to identify falsified transactions by pointing the defense to massive spreadsheets it produced containing hundreds of thousands of rows of transactional data. One of the spreadsheets identified by the government in its April 3, 2026 letter (FBG_DOJ_00026061), including information for only one year's worth of transactions, contains 2,659,662 rows of data. *See* DuCharme Decl., Ex. D at 2 ("[T]he Government directs you to the records bearing bates numbers FBG_DOJ_00026057 through FBG_DOJ_00026078, which include a listing of factored receivables and First Brands Group ('FBG') Vizion data for factored receivables."). In total, the First Brands "Vizion data" to which the government directed Mr. James appears to contain information regarding 6,452,235 invoices issued by First Brands over the years 2023 to 2025. And despite alleging, in Count Three, a scheme to defraud First Brands' factors lasting from 2020 to 2025, the government has failed to direct Mr. James to any invoice information from before 2023.

These spreadsheets provide no information about which entries the government claims are fraudulent, let alone which were allegedly approved by Mr. James. Nor did the government identify a single underlying invoice that the defense could compare to the spreadsheets it identified. Moreover, the government only identified spreadsheets relating to factored "receivables," *i.e.*, First Brands invoices to its customers that presumably related to the alleged accounts receivable fraud. As to Mr. James' request regarding invoices issued to First Brands by its suppliers—the amounts at issue in the alleged accounts payable fraud—the government flatly refused to provide any information. *See* DuCharme Decl., Ex. C at 2; DuCharme Decl., Ex. D at 4 (asserting, as to these

requests, that "[t]he Indictment and the Government's discovery productions and pretrial disclosures to the defense provide ample notice of the charges against him").

Nor is this a case in which the government alleges that *every* invoice submitted during the relevant period was fraudulent. To the contrary, the spreadsheets identified by the government reflect millions of transactions, any number of which could be entirely legitimate. Adding more complication, the Indictment describes how First Brands utilized both "customer-linked factoring" and "third-party factoring." Indictment ¶ 8.  However, the Indictment limits its allegations of fraud to the third-party factoring, *see, e.g.*, *id.* ¶¶ 8, 15, further reducing the usefulness of the government's bare reference to listings and data regarding "factored receivables," which may well also include "customer-linked" factoring.

The court's decision in *United States v. Vaid*, No. 16-CR-763-LGS, 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017), is analogous. In that case, involving alleged Medicaid fraud, the government had produced a spreadsheet containing 500,000 lines of reimbursed transactions, and the defendants sought a bill of particulars identifying "which insurance claims were false and fraudulent." *Id*. In granting that portion of defendants' motions, the court recognized that:

> In cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions it intends to prove are fraudulent if this information is not ascertainable; otherwise, in effect, 'the burden of proof impermissibly [may] shift[]' to the defendant to prove the documents or transactions are not fraudulent.

*Id*. (quoting *Bortnovsky*, 820 F.2d at 575) (brackets in original). The court went on to find that "[g]iving Defendants data and documents for over 500,000 claims but not specifying which ones it will seek to prove at trial were fraudulent does not enable Defendants to prepare for trial or prevent surprise." *Id*.; *see also United States v. Rinsch*, 807 F. Supp. 3d 238, 244 (S.D.N.Y. 2025) (ordering bill of particulars "specifi[ying] [] each of the materially false statements that [the

government] will contend at trial were made by the defendant or his agents to the victim of the defendant's allegedly fraudulent scheme").

So too here. Requiring Mr. James to sift through records containing millions of rows of data to determine which invoices the government intends to challenge presents precisely the sort of issue that warrants a bill of particulars. Because the specific invoices and transactions allegedly directed or approved by Mr. James lie at the core of the government's knowledge-and-intent theory, the Court should require the government to identify the invoices and related transactions that it intends to prove were fraudulent. *See Kahale*, 789 F. Supp. 2d at 376 (recognizing that in cases like this a bill of particulars is necessary to prevent "the quintessential 'needle in a haystack' problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent"). Here, where the government has directed Mr. James to its production of data regarding nearly 6.5 million invoices in connection with a purported five-year scheme, finding the needle in the haystack is precisely what the defense is left to do.

## II.    The Government Should Describe Mr. James' Role

The government should provide a bill of particulars identifying the nature and scope of Mr. James's alleged role in the charged fraud schemes. The Indictment alleges only that Mr. James acted with Patrick James and "others known and unknown" in furtherance of the schemes, *see* Indictment ¶¶ 39-41, 43, 45, 47, 49, 51, 53, but does not identify the specific conduct Mr. James allegedly undertook to advance those schemes.

This request seeks the core allegations defining Mr. James's alleged role, not evidentiary detail. *Cf. Wang*, 2024 WL 1251105, at *4 (denying a bill of particulars seeking evidentiary detail where the indictment specified the defendant's alleged role in controlling bank accounts and misappropriating funds). Here, in contrast to *Wang*, the Indictment does not explain what Mr.

-17-

James allegedly did, apart from grouping him with Patrick James and unidentified "others." Without notice of the specific acts attributed to him, Mr. James cannot meaningfully assess the me's theory of his participation or prepare a defense to the charged schemes.

*United States v. Murgio*, 209 F. Supp. 3d 698, 720 (S.D.N.Y. 2016), is instructive. In *Murgio*, the court required the government to provide a bill of particulars identifying the laws or duties that a co-defendant allegedly intended to violate in furtherance of a bribery conspiracy. The government's representation that it would prove, "among other things," violations of unspecified credit union regulations was inadequate because it failed to identify which regulations were at issue and preserved the government's ability to rely at trial on other undisclosed legal duties. *Id.* That uncertainty, the court held, was precisely what a bill of particulars is designed to prevent: without knowing the specific laws or duties the government intended to prove, the defendant could not adequately "prepare for trial [and] prevent surprise." *Id.* (quoting *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 150 (2d Cir. 2008)); *see also United States v. Carona*, No. 06-CR-224-AG, 2008 WL 1970199, at *2 (C.D. Cal. May 2, 2008) (ordering bill of particulars to prevent unfair surprise at trial where government failed to identify specific acts within a three-year charging period).

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988), is equally illustrative. There, the Second Circuit held that the district court abused its discretion in denying a bill of particulars as to RICO conspiracy and extortion charges where the defendant had notice only of his alleged role in extortionate schemes involving one company but was confronted at trial with evidence of specific extortionate acts directed at other companies. *Id.* at 1154. The same risk is present here. Without a bill of particulars identifying the nature and scope of Mr. James's alleged participation in the charged schemes, the government would remain free to shift among different lenders, financial

institutions, and transactions at trial, leaving Mr. James exposed to precisely the kind of unfair surprise that *Davidoff* prohibits.

**III.    The Government Should Provide Particulars Of The Money Laundering Charge**

Count Nine alleges a three-year conspiracy, from 2022 through 2025, to commit money laundering. *See* Indictment ¶¶ 54-56. But beyond the statutory boilerplate it explains only that Mr. James "and others[] agreed to disguise the proceeds of fraudulent representations to the Off-Sheet Lenders of First Brands, including through transactions designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity alleged in Count 8." Indictment ¶ 56.

The Indictment fails to provide information that would allow Mr. James to understand the parameters of the alleged conspiracy, let alone how Mr. James was involved. The James Entities described in the Indictment were numerous, and the government has only identified a limited set of exemplar entities used in connection with the off-sheet lending. *See* DuCharme Decl., Ex. D at 3. As to the alleged scheme to launder proceeds of the off-sheet lending, the Indictment tells the defendants nothing about the particular entities, accounts, and transactions reflecting the alleged conspiracy.

Despite the Indictment lacking those particulars necessary to permit adequate trial preparation, the government refused to provide any information in response to Mr. James' requests regarding this count, characterizing these requests as impermissibly "calculated to obtain a preview of the Government's trial proof." DuCharme Decl., Ex. D at 4. To the contrary, Mr. James is entitled to sufficient information regarding the instrumentalities of the alleged money laundering scheme.  In *Wang*, for example, the Court held that "[s]pecifying four countries and forty-seven entities—when a 'complex web' of over 500 accounts and eighty entities are allegedly implicated

-19-

by the scheme—[did] not provide Wang with enough information about the accounts and entities at issue." *Wang*, 2024 WL 1251105, at *1, 5 (granting motion for bill of particulars in connection with charges of "operating a scheme to defraud thousands of investors out of more than $1 billion [and] laundering the proceeds through foreign and domestic entities").

Here, in contrast, the government has failed to specify any account or entity that was implicated in the alleged money laundering conspiracy, improperly forcing Mr. James to "attempt to guess at which transactions . . . were allegedly improper." *Id.* at *5; *cf.*, *United States v. Leon*, No. 08-CR-65, 2008 WL 4966904, at *1 (D. Vt. Nov. 18, 2008) (denying motion for bill of particulars regarding money laundering charge because the government had provided "the date of each money laundering transaction, as well as cash receipts for 'many' of the monthly rent payments" allegedly made with proceeds from unlawful activity).[3]

Thus, in order to allow the preparation of an adequate defense, Mr. James is entitled to additional details about the money laundering charge, including the dates and amounts of the alleged transactions and the specific entities and accounts involved.

## CONCLUSION

For the reasons set forth above, and those set forth in the Patrick James Motion, Mr. James respectfully requests that the Court order the government to provide a bill of particulars describing (1) each co-conspirator alleged to have acted with Mr. James; (2) each financial institution, lender, and victim allegedly affected or defrauded under each charged count; (3) the specific invoices, transactions, and false financial statements that Mr. James allegedly directed or approved; (4) the

---

[3] Additionally, the court recognized that, unlike in the Indictment here, the money laundering count in *Leon* provided sufficient detail. *Leon*, 2008 WL 4966904, at *1. There, the indictment included specific references to "cash rental payments for $1,200 - $1,400 per month, to rent a property at 280 Leriche Road, Hyde Park, Vermont, with the intent to carry on a specified unlawful activity, to wit, the manufacture and distribution of controlled substances." *United States v. Leon*, No. 08-CR-65, D. Vt. 2008 (Dkt. No. 21).

-20-

-21-

nature and extent of Mr. James' role in the alleged schemes; and (5) the specific transactions,

entities, and accounts underlying the money laundering conspiracy charged in Count Nine.


Dated: New York, New York
       July 31, 2026

                                        Respectfully submitted,

                                        BRACEWELL LLP

                                        By: */s/ Seth D. DuCharme*
                                            Seth D. DuCharme
                                            Nicole Boeckmann
                                            David A. Shargel
                                            31 West 52nd Street, 19th Floor
                                            New York, New York 10019
                                            (212) 508-6100
                                            seth.ducharme@bracewell.com
                                            nicole.boeckmann@bracewell.com
                                            david.shargel@bracewell.com