**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

PATRICK JAMES and EDWARD JAMES,

Defendants.

Case No.: 1:26-CR-29 (AT)

**OMNIBUS REPLY IN FURTHER SUPPORT OF DEFENDANT EDWARD JAMES'S PRETRIAL MOTIONS**

BRACEWELL LLP
31 West 52nd Street
Suite 1900
New York, New York 10019
(212) 508-6100

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 5

I. Mr. James's Motion To Sever Should Be Granted ..... 5

A. Joint Trial Will Not Be More Efficient ..... 5

B. Severance Is Warranted Because Patrick And Ed Will Advance Mutually Antagonistic Defenses ..... 6

C. Severance Is Warranted To Prevent The Prejudice Of Double Prosecution ..... 8

D. Patrick's Manifest Culpability Will Substantially Prejudice Ed ..... 12

II. Mr. James's Rule 16 Motion Should Be Granted ..... 14

A. The Government Should Be Compelled To Produce Certain Highly Material First Brands Documents Under The Existing Grand Jury Subpoena ..... 14

B. The Government Should Be Precluded From Making Use Of Its Untimely Productions ..... 18

III. Mr. James's Motion to Suppress Should Be Granted ..... 24

A. Mr. James Has Standing Because He Has Protected Privacy Interests In Both His Microsoft And Apple iCloud Accounts ..... 24

B. Evidence Obtained Under The Microsoft Warrant Should be Suppressed For Overbreadth And Lack Of Particularity ..... 26

1. The Microsoft Warrant's January 2020 Start Date Is Overbroad And Lacks Adequate Support In Probable Cause ..... 26

2. The Microsoft Warrant's Generic List Of Items To Be Seized Does Not Supply The Required Particularity ..... 28

C. The Apple Warrant is Overbroad Because Its Authorized Search Of Intimate Personal Data Exceeds The Affidavit's Text Message Showing ..... 29

D. The Government Has Not Established Timely And Reasonable Execution of the Microsoft And Apple Searches ....................................... 30

E. The Exclusionary Rule Applies Because The Government Cannot Cure These Defects Merely By Invoking Good Faith ............................... 32

IV. Mr. James's Motion To Dismiss Should Be Granted ............................................ 33

A. Counts Three, Four, And Eight Should Be Dismissed As Impermissibly Multiplicitous Of Count Six ............................................. 33

B. Counts Two, Six, And Seven Should Be Dismissed For Lack Of Specificity ............................................................................................. 37

C. The Government Has Inadequately Alleged Venue .................................. 39

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Donnelly v. DeChristoforo*,
416 U.S. 637 (1974)....................14

*In re Rsrv. Fund Sec. & Derivative Litig.*,
275 F.R.D. 154 (S.D.N.Y. 2011)....................24

*Russell v. United States*,
369 U.S. 749 (1962)....................36, 39

*United States v. Abboud*,
438 F.3d 554 (6th Cir. 2006)....................28

*United States v. Agnello*,
367 F. Supp 444 (E.D.N.Y. 1973)....................14

*United States v. Anderson*,
416 F. Supp. 2d 113 (D.D.C. 2006)....................15

*United States v. Beckford*,
962 F. Supp. 748 (E.D. Va. 1997)....................15

*United States v. Bermudez*,
526 F.2d 89 (2d Cir. 1975)....................30

*United States v. Calhelha*,
456 F. Supp. 2d 350 (D. Conn. 2006)....................40

*United States v. Cardascia*,
951 F.2d 474 (2d Cir. 1991)....................6, 7, 8

*United States v. Carton*,
2018 WL 3559172 (S.D.N.Y. July 10, 2018)....................10

*United States v. Chacko*,
169 F.3d 140 (2d Cir. 1999)....................34

*United States v. Chuang*,
897 F.2d 646 (2d Cir. 1990)....................24

*United States v. Cioffi*,
668 F. Supp. 2d 385 (E.D.N.Y. 2009)....................26

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011)....................32

*United States v. Dumitru*,
No. 18 Cr. 0243 (LAK), 2018 WL 3407703 (S.D.N.Y. 2018)....................36

*United States v. Dupigny*,
2019 WL 2327697 (S.D.N.Y. May 30, 2019)....................10

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008)....................32

*United States v. Fried*,
450 F. Supp. 90 (S.D.N.Y. 1978)....................36

*United States v. Gallo*,
654 F. Supp. 463 (E.D.N.Y. 1987)....................15

*United States v. Galpin*,
720 F.3d 436 (2d Cir. 2013)....................29

*United States v. George*,
975 F.2d 72 (2d Cir. 1992)....................32

*United States v. Graham*,
No. 99 Cr. 271 (CFD), 2000 WL 1902425 (D. Conn. Dec. 21, 2000)....................22, 23

*United States v. Green*,
144 F.R.D. 631 (W.D.N.Y. 1992)....................23

*United States v. Gruttadauria*,
439 F. Supp. 2d 240 (E.D.N.Y. 2006)....................39

*United States v. Guerrero*,
No. 09 Cr. 339, 2010 WL 1790400 (S.D.N.Y. Apr. 30, 2010)....................22

*United States v. Gupta*,
No. 11 Cr. 907 (JSR), 2012 WL 1066804 (S.D.N.Y. 2012)....................37

*United States v. Halkbank*,
No. 15 Cr. 867 (RMB), 2020 WL 5849512 (S.D.N.Y. 2020)....................36

*United States v. Javice*,
No. 23 Cr. 251 (S.D.N.Y. Nov. 7, 2023)....................15, 16, 17

*United States v. Jordan*,
316 F.3d 1215 (11th Cir. 2003)....................15

*United States v. Leon*,
468 U.S. 897 (1984) ....................................................................................................32

*United States v. Maher*,
120 F.4th 297 (2d Cir. 2024) ........................................................................................26

*United States v. Martin*,
426 F.3d 83 (2d Cir. 2005)...........................................................................................28

*United States v. Mason*,
6 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008).......................................23

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ....................................................................25, 32

*United States v. Monsanto Lopez*,
798 F. App'x 688 (2d Cir. 2020) ...................................................................................22

*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020)..........................................................................31

*United States v. Nordlicht*,
No. 16 Cr. 00640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018) ...................11

*United States v. Panza*,
750 F.2d 1141 (2d Cir. 1984)...................................................................................15, 16

*United States v. Ramos*,
346 F. Supp. 2d 567 (S.D.N.Y. 2004)..........................................................................14

*United States v. Richards*,
659 F.3d 527 (6th Cir. 2011) ........................................................................................15

*United States v. Saab*,
No. 19 Cr. 676 (PGG), 2021 WL 5868157 (S.D.N.Y. 2021) .......................................36

*United States v. Sezanayev*,
No. 17 Cr. 262 (LGS), 2018 WL 2324077 (S.D.N.Y. May 22, 2018) .........................10

*United States v. Shkreli*,
260 F. Supp. 3d 247 (E.D.N.Y. 2017) ....................................................................5, 9, 10

*United States v. Shkreli*,
No. 15 Cr. 00637 (KAM), Dkt. No. 159 .........................................................................9

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003)...........................................................................................13

*United States v. Teague*,
No. 25 Cr. 40 (VSB), 2026 WL 1998633 (S.D.N.Y. July 10, 2026)............................5, 10, 14

*United States v. Thomas*,
No. 25 Cr. 33, 2026 WL 1972091 (D. Vt. July 8, 2026) ......................................................23

*United States v. Tuzman*,
301 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................................................10

*United States v. Vilar*,
2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)...............................................................29

*United States v. Wey*,
256 F. Supp. 3d 355 (S.D.N.Y. 2017)........................................................................24

*United States v. Wilson*,
No. 01 Cr. 53 (DLC), 2001 WL 798018 (S.D.N.Y. July 13, 2001)........................................40

**Statutes**

18 U.S.C. § 1001 .......................................................................................................36

18 U.S.C. § 1546(a) ...................................................................................................36

**Rules**

Fed. R. Crim. P. 7 .......................................................................................................38

Fed. R. Crim. P. 7(f) ...................................................................................................40

Fed. R. Crim P. 12(b)(3) ............................................................................................36

Fed. R. Crim. P. 16 .......................................................................2, 14, 15, 16, 19, 21, 22, 23

Fed. R. Crim. P. 16(d)(2)(A).......................................................................................23

Fed. R. Crim. P. 16(d)(2)(C).......................................................................................23

**Constitutional Provisions**

U.S. Const. Amend. IV ..........................................................................................3, 28

U.S. Const. Amend. VI ..............................................................................................39

**Other Authorities**

*Create Unique, Random Email Addresses with Hide My Email and iCloud+*,
Apple Support, https://support.apple.com/guide/icloud/what-you-can-do-with-icloud-and-hide-my-email-mme38e1602db/icloud ..............................................................25

## PRELIMINARY STATEMENT

The government's omnibus opposition to the pretrial motions filed by Edward James ("Mr. James" or "Ed"), dated October 19, 2026 (Dkt. No. 143) ("Opposition" or "Opp."), provides no basis to deny the motion to sever, the motion to compel production and preclude the introduction of untimely disclosed evidence, the motion to suppress, or the motion to dismiss. Across Mr. James's motions, the government's invocations of lack of prejudice, efficiency, its voluminous discovery productions, good faith, and pleading standards simply do not answer the concrete threats to a fair trial raised by the motions.

***The Motion to Sever (Dkt. No. 111)***

As set forth in Mr. James's opening brief, a joint trial would force Mr. James to defend against both the government and his brother. Patrick's motion makes clear that he does not merely intend to deny wrongdoing; he intends to prove that Ed orchestrated the charged conduct and to introduce evidence of Ed's alleged self-dealing, even if the government does not. Ed's defense is the opposite, as he will show that Patrick exercised complete control over First Brands Group ("First Brands" or "FBG"), including over the company's finances, directed the alleged misconduct, and kept Ed in the dark. That conflict would unfold against an overwhelming body of evidence concerning only Patrick, [redacted] None of that witness-related conduct is attributable to Ed, and a joint trial would force him to bear the risk that the jury would treat evidence of Patrick's consciousness of guilt as evidence against both brothers.

This is not ordinary "finger pointing," and the government describing it that way does not make it so. Nor can the government's generic assurances about limiting instructions, or its claims about the need for efficiency, cure the prejudice and disruption that Ed and Patrick's competing trial strategies would produce. No safeguard can adequately address the danger that the jury would

mistake the brothers' competing accusations for proof that they must both be guilty. The only way to avoid that threat is through individualized determinations of guilt afforded by separate trials.

***The Rule 16 Motion (Dkt. No. 118)***

The government does not dispute that the materials sought by Mr. James's discovery motion are lacking, and it should not be permitted to simply throw up its hands and claim that its Rule 16 obligations have been satisfied by its existing productions. The government's own authority confirms that the Court has the power to require targeted production under the government's existing subpoenas.

Mr. James's motion seeks no more than discrete sets of materials central to the allegations against him and essential for preparing his defense. For example, the government claims that invoices were fabricated yet refused to obtain and produce the invoices themselves. Nor can the government justify obtaining complete First Brands files for Patrick James and Andrew Brumbergs while leaving the files related to Mr. James and Stephen Graham incomplete. And Mr. James's request for a privilege log that simply allows him to assess First Brands' privilege assertions is far from "moot," as the government says. All the government has done is request a privilege log for the Microsoft Warrant, which the government apparently has not yet received. That request does not obviate Mr. James's request or his need for the actual log. More importantly, the government has not requested, and Mr. James has still not received, a log from First Brands regarding documents withheld by the company in response to the grand jury subpoenas, which were substantially broader than the Microsoft Warrant in any event.

Further, the Opposition fails to adequately address the government's repeated (and ongoing) failures to adhere to its representations concerning when it would complete the production of Rule 16 materials. As of the date of this reply, certain materials from the search

warrants are still outstanding. Accordingly, the Court should preclude the government from making use of its untimely productions at trial.

***The Motion to Suppress (Dkt. No. 122)***

The Fourth Amendment requires more than a warrant bearing a judge's signature to justify the government's search and seizure of a citizen's records. It requires probable cause supporting the scope of the search, particular limits on what may be searched and seized, and reasonable execution. Mr. James challenges the search of his own Microsoft mailbox and personal iCloud account. The government's opposition does not justify the overbreadth, lack of particularity, and unreasonable execution of the searches and seizures of records authorized by the Microsoft and Apple Warrants. The existing record supports his privacy interests in both accounts, and a separate declaration is not an invariable prerequisite to standing.

The Microsoft Warrant reaches back to January 2020 without any factual basis for that starting date and authorizes seizure of sweeping categories of records concerning open-ended "Relevant Entities." The opposition answers neither defect and instead relies on a mischaracterization of a witness interview to try to supply the particularity the Warrant lacks.

The Apple Warrant makes a different but equally unsupported leap: a handful of business-related text messages (only one of which Mr. James sent) to justify a search of essentially every category of data stored in his personal iCloud account, including large repositories of personal records such as all photographs, videos, and location data. The issue, however, is not whether Apple may produce records to the government before investigators select responsive evidence, but whether probable cause supports extending the search to those additional repositories of personal data in the first place.

The government's document review chronology likewise leaves critical questions unanswered: when substantive review of the Microsoft Warrant return began, what occurred during the intervening periods, and whether later searches examined only newly released records or revisited material already reviewed. Production dates and privilege screens do not substitute for that history. Nor does invoking good faith establish objectively reasonable reliance on the deficient authorizations challenged here.

Accordingly, evidence obtained from the invalid authorizations contained in the Microsoft and Apple Warrants should be suppressed.

***The Motion to Dismiss (Dkt. No. 114)***

Finally, Mr. James's motion to dismiss should be granted, and the Opposition substitutes general propositions of law for answers to the challenges raised by the defense. As for Mr. James's argument that Counts Three, Four, and Eight (each charging wire fraud) are multiplicitous of Count Six (also charging wire fraud), nobody disputes that separate wires may support separate charges. But that argument misses the point, which is whether Counts Three, Four, and Eight charge any offense conduct that is distinct from Count Six and its broad reference to the same "lenders" that are encompassed by the narrower groups identified in the other counts. They do not, and for that reason are subject to dismissal as multiplicitous.

With respect to Mr. James's arguments about the lack of specificity underlying Counts Two, Six, and Seven, the government argues only that the Indictment is sufficient because it tracks the statutory language. But it isn't, because despite the "speaking" portion of the Indictment, it still fails to explain which counterparties, property, and misrepresentations underlie those counts. And while the government again points to the mountain of discovery it produced, that discovery and related disclosures are not a substitute for definite accusations.

As for venue, repeating "in the Southern District of New York and elsewhere" throughout the Indictment should not be enough given the circumstances of this case, where Mr. James lives in Ohio, First Brands was based in Ohio and had no New York operations, and there is not a single non-boilerplate allegation in the Indictment to even suggest that any of the charged conduct took place here. If the government was truly confident that it could establish venue in this District, it could have offered something—anything—in its Opposition supporting a connection to New York, but it didn't. At a minimum, the government should be required to provide Mr. James the particulars, even by way of a mere example, establishing venue.

## ARGUMENT

### I. Mr. James's Motion To Sever Should Be Granted

#### A. Joint Trial Will Not Be More Efficient

In arguing that a joint trial would be more efficient, the government fails to address the evidentiary disputes inherent in Patrick's and Ed's competing defenses, as explained in the motion to sever. Both Patrick and Ed intend to introduce evidence implicating the other, requiring the Court to resolve defense objections relating not only to the government's proof, but also to the evidence Patrick and Ed will offer against one another. Those disputes would interrupt the presentation of evidence, prolong the trial, and require the jury to distinguish among the permissible purposes for which evidence may be considered against each defendant. The efficiencies of a joint trial must therefore be assessed against these foreseeable complications and not presumed merely because Patrick and Ed would be tried together. *See United States v. Teague*, No. 25 Cr. 40 (VSB), 2026 WL 1998633, at *6 (S.D.N.Y. July 10, 2026) (citing *United States v. Shkreli*, 260 F. Supp. 3d 247, 256-57 (E.D.N.Y. 2017)) (granting severance to "prevent substantial prejudice" where constant objections would prolong and disrupt an already complex trial and likely confuse the jury).

The government acknowledges that "Ed[]'s alleged concealment of his personal financial gain from Patrick [] is not a charged offense," but rather an "uncharged dispute between the brothers." Opp. at 11. Yet, as further discussed in Section I.B. *infra*, Patrick intends to use that alleged conduct to implicate Ed in the charged schemes and support Patrick's defense that he was unaware of the alleged fraud, forcing Ed to defend against both the government's case and Patrick's accusations. A joint trial would thus draw the Court and jury into litigating disputes that the government attempts to distinguish from the charged offenses, generating further evidentiary objections and diverting attention from the charges to be decided.

### B. Severance Is Warranted Because Patrick And Ed Will Advance Mutually Antagonistic Defenses

Severance is warranted because Patrick and Ed will advance mutually exclusive defenses that cannot fairly be adjudicated in a joint trial. Relying on *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991), the government contends that accepting one defendant's defense would not necessarily require the jury to convict the other. *See* Opp. at 10. However, unlike the defenses in *Cardascia*, Patrick's and Ed's defenses are mutually exclusive. In *Cardascia*, both Cardascia and Rizzo simply denied participating in the conspiracy. *See id.* at 485. Cardascia maintained that his 11 co-defendants had defrauded both him, as the bank's president, and the bank, while Rizzo maintained that he was an unwitting bystander implicated only by his co-defendants' uncorroborated assertions. *See id.* The Second Circuit upheld denial of severance because Cardascia and Rizzo failed to demonstrate that accepting their defenses necessarily required convicting their co-defendants: the jury could have attributed misconduct to other participants while acquitting the defendants on trial. *See id.*

Here, by contrast, Patrick and Ed will each deny participating in the charged schemes while identifying the other as responsible for perpetrating them. Ed intends to show [redacted]

[redacted] *See* Motion to Sever at 14. Patrick, in turn, will contend [redacted] *Id.*; *see also* Dkt. No. 108 ("PJ Motion to Sever") at 2, 7. These defenses are not parallel claims of non-involvement: each defendant's account places responsibility on the other and contradicts the other's claim of innocence.

The government sidesteps this conflict by asserting that Patrick's anticipated defense concerning Ed's alleged self-dealing "does not meet the charges against [Ed]." Opp. at 10-11. This characterization disregards Patrick's express intention to prove that "Ed's conduct shows that he alone organized, managed, and directed the alleged fraud." PJ Motion to Sever at 1. Patrick does not merely propose to air collateral grievances; he intends to show that "Ed and others were exclusively responsible for the conduct alleged in the Indictment" and that Ed "misrepresented and concealed material financial information from lenders to keep their money flowing into FBG." *Id.* at 2, 8. Patrick further explains that his evidence of Ed's alleged "lies, deception, and concealment" will "prove that Ed was solely and exclusively responsible for the schemes alleged in the Indictment," effectively making Patrick an "'echo chamber' for the prosecution." *Id.* at 12; *see also id.* at 13 (describing evidence that "Ed alone orchestrated the alleged scheme"). The

government cannot avoid the antagonism between these defenses by recasting Patrick's stated effort to establish Ed's responsibility for the charged fraud as a dispute unrelated to the charges. Patrick's own description places Ed's culpability at the core of his defense and directly contradicts Ed's defense that Patrick, not Ed, orchestrated the charged schemes.

Moreover, mutual exclusivity is not the only basis for severance. Severance is also warranted where "antagonism at the *essence* of the defenses prevails to such a degree—even without being mutually exclusive—that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." *Cardascia*, 951 F.2d at 484 (emphasis in original). Risk of such a negative inference is particularly acute here because the conflict between Patrick's and Ed's defenses concerns the central issue of who knowingly participated in the charged schemes. Each defendant will seek to establish his own innocence by presenting the other as a knowing ringleader whose misconduct he neither knew of nor controlled, and who deliberately kept the other in the dark. Faced with these competing accusations, the jury will likely treat the conflict itself as evidence that both defendants are guilty, rather than assess the evidence against each independently.

**C. Severance Is Warranted To Prevent The Prejudice Of Double Prosecution**

A joint trial would subject Ed to prosecution not only by the government, but also by Patrick. The government argues that neither defendant concedes that the charged schemes occurred and that neither can act as a second prosecutor without asserting that fraud occurred and that the other committed it. *See* Opp. at 13. However, Ed intends to establish that Patrick, together with Graham and Brumbergs acting at Patrick's behest, was responsible for the charged schemes. *See* Motion to Sever at 7-8. To that end, [redacted] *See id.* at 16. Patrick, in turn, intends to present evidence that "Ed alone

orchestrated the alleged scheme." PJ Motion to Sever at 13. Each defendant will thus affirmatively seek to establish the other's culpability, rather than merely deny his own involvement.

In addition, Patrick's severance motion confirms that Patrick intends to present evidence that Ed entered into agreements with First Brands' lenders on terms that he claims, "crippled the company but allowed Ed to line his own pockets," and that Ed "concealed his self-dealing from Patrick." *Id.* at 1, 12. Specifically, [redacted] *See* Motion to Sever at 16. Patrick intends to develop this theory "even if the government does not," (PJ Motion to Sever at 12) exposing Ed to the precise type of prejudice that warranted severance in *Shkreli*. Ed would thus have to defend against both the government's case and Patrick's allegations of self-dealing beyond the charged conduct, creating a serious risk that the jury could not reliably determine Ed's guilt or innocence.

In its attempt to distinguish *Shkreli*, the government flatly mischaracterizes the court's holding. The attorney declaration in *Shkreli* did not "stipulate[e]" that the government "has proved (1) the conspiracy and schemes as charged in the indictment existed beyond a reasonable doubt and (2) that the other [defendant] is guilty beyond a reasonable doubt[.]" Opp. at 13. Rather, the declaration stated Mr. Greebel's counsel's "present intention" was "to present evidence at trial that," among other things, "Mr. Shkreli deceived Mr. Greebel," that "Mr. Shkreli failed to disclose on multiple occasions material information to Mr. Greebel," and that "Mr. Shkreli is guilty of committing fraud." *United States v. Shkreli*, No. 15 Cr. 00637 (KAM), Dkt. No. 159 ¶¶ 2-4 (S.D.N.Y. Feb. 17, 2017). Greebel's counsel's statement of his intended defense was not a concession, much less an admissible stipulation, that "the conspiracy and schemes as charged in

the indictment existed beyond a reasonable doubt[.]" Opp. at 13. It instead described a trial strategy materially similar to those Patrick and Ed intend to pursue here: establishing his client's innocence by presenting evidence of his co-defendant's misconduct.

Further, the government's attempt to confine *Shkreli*'s holding only to cases involving an attorney-client relationship or an attorney declaration mistakes the factual circumstances of *Shkreli* as prerequisites to relief. The prevailing concern in *Shkreli* was whether a joint trial would compromise a fair determination of guilt as to each defendant. *See* 260 F. Supp. 3d at 256-57. At least one court in this district has since relied on *Shkreli* to grant severance absent an attorney-client relationship or an attorney declaration, finding a "serious risk that the jury would be prevented from making a reliable judgment about guilt or innocence even with limiting instructions by the court" in a multi-defendant conspiracy case. *See Teague*, 2026 WL 1998633, at *6 (citing *Shkreli*, 260 F. Supp. 3d at 256).

The remaining cases cited by the government in an attempt to distinguish *Shkreli* concern speculative antagonism, not a defendant's stated intent to act as a second prosecutor. For example, the government cites *United States v. Tuzman*, 301 F. Supp. 3d 430 (S.D.N.Y. 2017), as "declin[ing] to follow *Shkreli* … where defendants asserted antagonistic defenses." Opp. at 14. But *Shkreli* rested on the "legally cognizable prejudice" of double prosecution, not merely antagonistic defenses. 260 F. Supp. 3d at 257. Neither defendant in *Tuzman* stated an intent to introduce evidence of fraud by the other. *See* 301 F. Supp. 3d at 444. Nor did any defendant in *United States v. Sezanayev* contend that a co-defendant would act as a second prosecutor. *See* No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *3-5 (S.D.N.Y. May 22, 2018).[1] Here, in contrast, both defendants

[1] Similarly, in *United States v. Carton*, counsel asserted only his client's innocence, not his co-defendant's guilt. *See* No. 17 Cr. 680 (CM), 2018 WL 3559172, at *4 (S.D.N.Y. July 10, 2018). And in *United States v. Dupigny*, the movant asserted only that his defense "may bolster the Government's case against [his co-defendant]" without establishing prejudice to himself. No. 18 Cr. 528 (JMF), 2019 WL 2327697, at *1 (S.D.N.Y. May 30, 2019). Here, Patrick and Ed

have voiced their intentions to act as a second prosecutor: [redacted] *See* Motion to Sever at 10-11.

Moreover, contrary to the government's contention, the decision in *United States v. Nordlicht* did not turn on the defendant Shulse's alleged disclosure of misconduct to the SEC. The court granted severance because Shulse's trial strategy would subject his co-defendant, Nordlicht, to double prosecution and generate frequent objections to Shulse's evidence and arguments, seriously disrupting the trial. *See Nordlicht*, No. 16 Cr. 00640 (BMC), 2018 WL 1796542, *2-3 (E.D.N.Y. Apr. 16, 2018). The same concerns are present here. Patrick's proposed introduction of uncharged conduct to inculpate Ed goes beyond ordinary finger-pointing and would place affirmative evidence against Ed before the jury independent of the government's case-in-chief. Ed's defense would likewise depend on evidence implicating Patrick. The resulting disputes over competing accusations, evidence, and arguments would both prejudice Patrick and Ed and disrupt the trial.

Recently disclosed discovery materials concerning Lisa Ruth ("Ruth"), [redacted] further underscore the risk of double prosecution to Ed. As detailed in Mr. James's Supplemental Memorandum in Support of Motion to Sever (Dkt. No. 141) ("Supplemental Memorandum"), [redacted]

---

will each affirmatively accuse the other of wrongdoing and present evidence bolstering the government's case against the other, exposing both to double prosecution.

[redacted] These statements closely parallel Patrick's previewed defense: that he delegated responsibility for lender relations to Ed, that Ed engineered damaging side deals with First Brands' financing counterparties, and that Ed concealed his alleged self-dealing from Patrick. *See* PJ Motion to Sever at 1-2, 4-9, 19. [redacted]

**D. Patrick's Manifest Culpability Will Substantially Prejudice Ed**

A joint trial would expose Ed to substantial spillover prejudice from the overwhelming evidence of Patrick's guilt. The government dismisses this argument as resting on nothing more than the disparity in evidence ordinarily present in a multi-defendant conspiracy trial. *See* Opp. at 17-19. But Ed does not seek severance simply because the government may introduce slightly more evidence against Patrick. Rather, a joint trial would expose the jury to an overwhelming body of highly prejudicial evidence uniquely concerning Patrick, including his alleged control of First Brands and its finance function, his direction of senior executives, his diversion of hundreds of

millions of dollars for his personal benefit, and the structural imbalance of the continuing financial crimes enterprise charge brought against Patrick alone. *See* Motion to Sever at 18-20. Much of that evidence does not bear on whether Ed knowingly joined the charged schemes, yet it would dominate the trial and create an acute risk that the jury would attribute Patrick's conduct and culpability to Ed. This is precisely the type of disparity that may warrant severance when "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant" that the jury cannot reliably assess guilt on an individualized basis. *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

The Ruth materials independently heighten the danger of spillover prejudice. As described in the Supplemental Memorandum, [redacted] Those allegations introduce a distinct and highly prejudicial category of alleged post-offense conduct [redacted] The Ruth materials therefore further widen the disparity between the nature of the evidence against the two defendants and magnify the risk that the jury will assess Ed through the lens of allegations directed specifically at Patrick.

Limiting instructions cannot cure this prejudice. The government's assertion that "it is well-established that *any* potential spillover prejudice can be adequately addressed by limiting instructions" overstates limiting instructions' protective reach. Opp. at 18 (emphasis added).

Indeed, courts recognize that some prejudice cannot be cured by such instructions. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) (noting that "some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect"); *United States v. Agnello*, 367 F. Supp 444, 447 (E.D.N.Y. 1973) (granting severance where voluminous evidence and circumstantial proof created a risk that the jury could not sort through the facts or assess each defendant independently). And the government's contention that "[p]rejudicial spillover warranting severance is, in general, an unlikely occurrence when all the defendants are charged under the same conspiracy count," Opp. at 16 (quoting *United States v. Ramos*, 346 F. Supp. 2d 567, 575 (S.D.N.Y. 2004)) is not a categorical rule that a shared conspiracy charge eliminates the risk of spillover prejudice where there are additional charges against only one defendant. *See, e.g., Teague*, 2026 WL 1998633, at *1 (recognizing the risk of spillover prejudice from evidence supporting charges against co-defendants alone, despite a conspiracy charge common to all defendants).

Accordingly, for the reasons set forth above, severance should be granted.

## II. Mr. James's Rule 16 Motion Should Be Granted

### A. The Government Should Be Compelled To Produce Certain Highly Material First Brands Documents Under The Existing Grand Jury Subpoena

The government misstates the law and the record of this case in opposing Mr. James's request for an order compelling the government to produce three discrete sets of materials central to the Indictment, essential to Mr. James's defense, and which the government has inexcusably permitted First Brands to withhold from production.

In contending that it cannot be compelled to seek and produce these materials, the government's response fails to address the cases relied upon in the motion explaining that Rule 16 "is intended to prescribe the minimum amount of discovery to which the parties are entitled, and

leaves intact a court's discretion to grant or deny the broader discovery requests of a criminal defendant." *United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011) (internal quotation marks omitted); *see* Dkt. No. 118 at 11 (citing, in addition to *Richards*, *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003), *United States v. Anderson*, 416 F. Supp. 2d 113, 113 n.2 (D.D.C. 2006), and *United States v. Beckford*, 962 F. Supp. 748, 754–55 (E.D. Va. 1997)). As the court stressed in *United States v. Gallo*, "[t]he Advisory Committee on Rules explicitly stated that the amended Rule 16 was to define only the *minimum* amount of discovery mandated," and the Criminal Rules "are intended, and must be construed, to 'enhance a just determination,' not to inhibit it." 654 F. Supp. 463, 471 (E.D.N.Y. 1987) (emphasis in original).

The government's own case law fails to support its position. The government relies only upon one out-of-Circuit authority from the Northern District of Ohio and *United States v. Javice*. *Javice*, however, makes clear that the relief Mr. James seeks is procedurally appropriate, warranted on the merits, and consistent with the approach taken by this Court. There, while the defendant's motion to compel the government to obtain additional materials from the third-party JPMorgan Chase ("JPMC") was denied in part, the Court provided substantial relief in ordering the government to "require JPMC to enlarge the number of custodians whose files should be searched." Dkt. No. 61, Order Regulating Proceedings, *United States v. Javice*, No. 23 Cr. 251 (S.D.N.Y. Nov. 7, 2023). Specifically, the Court ordered that "[t]he Government should require JPMC to search for, and produce, under the existing subpoenas, responsive documents in the files and emails" of two individuals identified by the defense, in additional to "all other JPMC officers or employees referenced in the Complaint." *Id.* In ordering this relief, the Court relied on *United States v. Panza*, noting the Second Circuit had considered "the production of 'files mentioned in

the indictment' in ruling the defendants had 'all information needed to prepare for trial.'" *Id.* (quoting *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)).

The materials sought in Mr. James's motion are equally tied to the government's own specific allegations in the Indictment. First, Mr. James seeks the invoices and representations made to the factors and supply-chain financers that form the basis of the alleged accounts receivable factoring and accounts payable financing schemes. *See* Dkt. No. 118 at 19–23. Having secured an Indictment centered around the alleged submission of "fake invoices," "falsified invoices," "fabricated invoices," "fraudulently inflated invoices," "fictious or overstated" invoices, "invoices … generated for transactions that never occurred," and invoices with "dollar amounts … altered to make them appear more valuable," it is indefensible for the government to have failed to produce the actual invoices themselves. Indictment ¶¶ 12–14, 16, 19. The same applies with respect to the alleged "spreadsheet-style data entries reflecting purported supplier invoice information" that underlie the alleged schemes. *Id.* ¶ 17.

In response, the government does not dispute that these materials are lacking from its productions. Rather, the government states only that it "has fulfilled its Rule 16 obligations by producing the invoices it has received from FBG." Opp. at 74. Having brought the Indictment that it did, the government should not be permitted to leave it at that. Due process and the fundamental fairness owed to criminal defendants require more.

The same applies with respect to Mr. James's request for the complete First Brands files for Mr. James and Stephen Graham. *See* Dkt. No. 118 at 23–25. Here, the government obtained from First Brands its complete sets of files for Andrew Brumbergs and Mr. James's co-defendant, Patrick James. *Id.* at 23. There is no explanation or excuse for the government's failure to seek and produce complete materials for Mr. James and Mr. Graham. In fact, this request is substantially

narrower than that granted in *Javice*, as it extends only to the defendant himself and a charged alleged co-conspirator, rather than all First Brands employees referenced in the Indictment.

Finally, regarding Mr. James's request for a privilege log sufficient to assess First Brands' privilege assertions, *see* Dkt. No. 118 at 25–28, the government states inaccurately that the request is "moot" because the government "has requested a privilege log from FBG and informed the defense of this request." Opp. at 52. In fact, all that the defense has been told is—as stated in the Opposition—that the government has requested a privilege log from First Brands with respect to the materials seized pursuant to the Microsoft Warrant. *See* Opp. at 78; Dkt. No. 121–16, Ex. P. to DuCharme Decl., Gov't Letter dated Aug. 21, 2026 at 2 (stating "the Government has requested that First Brands provide document-level detail about the bases for their assertions" of privilege over "documents in [the Microsoft Warrant] returns," while confirming, "[t]he Government has not received a privilege log from FBG in connection with any subpoena response"). The defense is not aware of any request made to First Brands by the government for any form of a privilege log regarding the documents First Brands withheld for privilege in response to the grand jury subpoenas, which were substantially broader than the Microsoft Warrant.[2]

Information disclosed by the government regarding the Microsoft Warrant materials over which First Brands asserted privilege makes clear the overbreadth of First Brands' approach, and the resulting need for the relief that Mr. James requests. With respect to the Microsoft Warrant, among other things, First Brands asserted privilege over numerous emails with third parties, the inclusion of which plainly vitiated any privilege that may have existed. More than this, these third

[2] Moreover, while the government's August 21, 2026 letter did not say when the government had requested this privilege log from First Brands, the government appears to have been provided with First Brands' "list of documents" over which it was asserting privilege over six months ago, in April 2026. It is now November, and no privilege log has been provided to the defense. That prolonged delay demonstrates why the Court's direction and enforcement are necessary.

parties include the alleged victims at the heart of the government's case: "Off-Sheet Lenders" like Onset Financial and AB CarVal; factors like Jefferies and Katsumi; and supply-chain financers like Raistone, among other central participants. *See* Ex. A.[3]

The government has provided no reason to believe that First Brands was any more discerning in withholding documents for privilege from its grand jury subpoena productions than it was in asserting privilege over the Microsoft Warrant returns. Thus, it is apparent that First Brands has withheld from production a significant number of material, non-privileged documents, while the government has refused to so much as request the preparation of a basic privilege log. Here, again, the government's inexplicable deference to First Brands in deciding what documents to produce should not go unremedied. The need for a privilege log sufficient to assess First Brands' withholding of documents for privilege is clear. Moreover, Mr. James' request is measured and would impose no undue burden. The government already touts its having requested a privilege log from First Brands concerning the Microsoft Warrant materials. There is no reason for it not to do the same respect to First Brands' grand jury subpoena productions.

### B. The Government Should Be Precluded From Making Use Of Its Untimely Productions

The government's mischaracterization of the record extends to its opposition to Mr. James's request that the Court preclude the government from introducing at trial any materials seized pursuant to the Microsoft Warrant, Apple Warrant, or Patrick Email Warrant that had not been produced as of the date of Mr. James's motion.

The government states that Mr. James seeks this relief "because the Government produced a single document and three sets of bank records over five months before trial." Opp. at 62. That

[3] Information regarding examples of such communications is contained in Exhibit A. This exhibit excerpts 25 rows from a 67,839-row spreadsheet provided to the defense containing metadata exported by the government concerning certain documents from the Microsoft Warrant returns over which First Brands asserted privilege.

is incorrect. Mr. James seeks this relief on the basis of the government's substantial and unexplained failure to adhere to its representations to the Court on April 30, 2026, that "production of Rule 16 discovery is substantially complete" and that it "anticipates producing the limited remaining materials in its possession no later than June 1." Dkt. No. 53 at 1. These "limited remaining materials" were to include all remaining responsive materials seized pursuant to the iCloud, Microsoft, and Patrick Email Warrants. *See* Dkt. 118 at 8–9. Indeed, on April 15, 2026, the government stated that it expected to have produced all responsive material seized from these warrants in advance of the then-scheduled April 27, 2026 status conference, with the exception of responsive returns from the Patrick Email Warrant, the review of which the government "expect[ed] to complete … promptly." Dkt. No. 45 at 4–5.

Notwithstanding these representations, as of the September 4, 2026 pre-trial motion deadline, the government had yet to *review*, much less produce, substantial portions of the Microsoft, iCloud, and Patrick Email Warrant returns. Dkt. No. 118 at 12–18. The government concedes (although it relegates this to a footnote) that it was not until October 5, 2026 that it produced additional materials from the Apple and Microsoft Warrant returns. *See* Opp. at 68 n.22. The government omits the volume of these productions, which totaled 863,962 pages, across more than 100,000 documents. *See* Ex. B, Gov't Letter dated Oct. 5, 2026. And while the government states that its production of returns from the Apple Warrant is now complete, it recognizes that any responsive materials from the Microsoft Warrant over which First Brands has improperly asserted privilege remain subject to production. *See* Opp. at 78 & n.27. As discussed in Section II.A *supra*, this is expected to be a substantial number of documents. Moreover, the Opposition fails to acknowledge that the government has *still* not produced any additional materials from the Patrick Email Warrant returns since its initial production on May 20, 2026.

Thus, with respect to the Microsoft and Apple warrant materials, rather than completing production by April 27 or June 1, the government took until October 5, 2026, and its review of the Microsoft Warrant materials remains unfinished pending the resolution of First Brands' privilege assertions. And far from representing the "limited materials" that the government stated remained in its possession, productions of these warrant materials alone totaled more than 100,000 documents. With respect to the Patrick Email Warrant materials, the government has yet to complete its review of these materials, much less its production to the defense.

The delay in the government's production of these materials cannot be justified, and it does not end there. As detailed in the motion, the government has made several additional significant, untimely productions. *See* Dkt. No. 118 at 12.

The government offers no adequate explanation for these delays. First, the Opposition recounts that, following the government's April 30 statements regarding the anticipated completion of its productions, "[o]n May 8, 2026, the Court set a trial date of February 9, 2027," suggesting that the adjournment somehow diminished the significance of the government's representations. Opp. at 64. This ignores, however, that the government provided this information in response to an order requiring it to inform the Court regarding the anticipated completion of discovery in connection with the Court's determination of a new trial date. *See* Dkt. No. 49. Thus, rather than excuse the government's delays, the adjournment only underscores their significance, because the Court set the trial date, at least in part, based on the government's representations concerning when discovery would be complete.

Second, the government incorrectly states that Mr. James "ignores how the defendants' privilege assertions and the filter process impact the timing of the completion of the Government's responsiveness review." Opp. at 62 n.19. To the contrary, the motion provided several reasons

why such an argument by the government would be unavailing. Dkt. No. 118 at 14–15. Mr. James has asserted privilege over fewer than 400 documents, and did so by April 10, 2026. *Id.* at 14. Moreover, the government continues to provide no explanation as to why the Defendants' privilege assertions would have so substantially impeded the government's review. It simply avers that privilege screens "were delayed considerably by the defendants' preparation of privilege logs." Opp. at 97. As explained in the Rule 16 motion, the government's assertions on this point are generic, unsupported, and unconvincing. And finally, the government was already aware of the defendants' privilege assertions when it made its representations to the court in April. Indeed, it advanced the same argument then in seeking to explain its delays in production up to that time. Dkt. No. 118 at 8-9 (citing Dkt. No. 45 at 4-5).

Third, the government faults Mr. James for "misread[ing] the Government's stated 'expectation' as a binding deadline," Opp. at 67–68, and contends that "the Government uses caveats such as 'substantially complete,' 'anticipates,' and 'expected' when describing its document productions precisely because the Government routinely quality-checks its productions and works with defense counsel to fix any production issues," *id.* at 67. These arguments simply do not align with the reality of the government's discovery deficiencies in this case. Mr. James does not seek to treat the government's April 30, 2026 representation to the Court that it "anticipated producing the limited remaining materials in its possession no later than June 1" as a binding deadline. Rather, he seeks to hold the government accountable when, without justification and causing substantial prejudice to the defense, it then takes until October to produce over 100,000 documents that had been in its possession since June 2025, and as of November has still not completed its productions.

The government further fails to dispute the prejudice caused by its untimeliness to the defense, contending that "Mr. James does not claim he is unable to review these limited materials in the forthcoming months." Opp. at 68. This argument ignores that, under the case schedule set by the Court, the government's discovery was to be completed well in advance of the pre-trial motion deadline, as well as the Defendants' deadline for expert disclosures. The government's production delays and still-incomplete review of the Microsoft and Patrick Email Warrant returns have undercut Mr. James's ability to make use of the government's discovery on the timetable contemplated by the Court's schedule. Further, as the government's belated productions were made only recently while the motion was pending (and other materials have yet to be produced), the full scope of the prejudice caused to Mr. James will not be known until these materials can be reviewed, and Mr. James reserves all rights in this respect.

The cases relied upon by the government are distinguishable and inapposite. *See* Opp. at 65. In *United States v. Monsanto Lopez*, after finding that no Rule 16 violation had taken place, the court further opined that the defendant had failed to "articulate[] on appeal a basis to find that he was prejudiced" by the government's production of undescribed "packages of Rule 16 material." 798 F. App'x 688, 690-691 (2d Cir. 2020). The case provides no indication that the materials produced were comparable in scale or significance to the government's substantial belated productions here from search warrant returns likely to be highly material to the case. *United States v. Guerrero* concerned the disclosure of a firearm that, upon being located, was "tested and produced [to] the defense counsel in a timely way," No. 09 Cr. 339, 2010 WL 1790400, at *1 (S.D.N.Y. Apr. 30, 2010), and *United States v. Graham* addressed the government's disclosure of the defendant's statements to defense counsel "a day or two" after "the government first determined the defendant had made the statements," with the court finding the government had

not acted unreasonably in failing to make this determination earlier. No. 99 Cr. 271 (CFD), 2000 WL 1902425, at *2 (D. Conn. Dec. 21, 2000). Neither addressed conduct like that of the government in this case.

Conversely, the government fails to distinguish *United States v. Mason*, 6 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008) and *United States v. Thomas*, No. 25 Cr. 33, 2026 WL 1972091 (D. Vt. July 8, 2026). *Mason* noted the prejudice inherent in "the fact that [the defendants] did not have [the late disclosed] information for the better part of a year or more," 2008 WL 281970, at *3. Here, Mr. James remained without access to responsive Microsoft Warrant returns until October 2026, notwithstanding these materials having been seized by the government in June 2025, and he remains without access to responsive Patrick Email Warrant returns today. And *Thomas* is directly on point not only in addressing government representations regarding the "minimal" Rule 16 discovery remaining that were contradicted by later productions, but also in finding prejudice through, among other things, "disrupted investigation[and] motions practice." 2026 WL 1972091, at *6-7.

Accordingly, the government should be precluded under Rule 16(d)(2)(C) from introducing as evidence materials seized pursuant to the Microsoft Warrant, Apple Warrant, or Patrick Email Warrant that had not been produced as of the date of the Rule 16 motion.

In the alternative, should the Court determine that preclusion is not appropriate at this time, Mr. James requests that pursuant to Rule 16(d)(2)(A), the Court set a reasonable date certain and well in advance of trial by which the government must produce relevant discovery material, with any later-produced materials subject to preclusion. *See United States v. Green*, 144 F.R.D. 631, 637 (W.D.N.Y. 1992) ("The trial court has considerable discretion regarding discovery matters under Rule 16.").

## III. Mr. James's Motion to Suppress Should Be Granted

### A. Mr. James Has Standing Because He Has Protected Privacy Interests In Both His Microsoft And Apple iCloud Accounts

Mr. James's challenge to the Microsoft Warrant is directed to the search of *his own mailbox*. *See* Dkt. No. 123–1, Ex. A ¶¶ 1, 10 (identifying the account at issue as Mr. James's individual email address and listing him as its user). First Brands Group's ownership of the corporate email account does not categorically preclude that claim, particularly given Mr. James's role as an executive officer of the company. "It is well-settled that a corporate officer or employee in certain circumstances may assert a reasonable expectation of privacy in his corporate office, and may have standing with respect to searches of corporate premises and records." *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990) (collecting cases). While the court in *Chuang* found the defendant had no privacy interest in the seized materials, the government conveniently neglects to mention that the materials at issue in *Chuang* were physical materials seized from the office of a different person—and even there the court observed that Chuang did have a legitimate expectation of privacy "in his own office." *Id.* at 650. "A highly fact-specific analysis is required, and cases largely turn on the particular policy language adopted by the employer." *In re Rsrv. Fund Sec. & Derivative Litig.*, 275 F.R.D. 154, 160 (S.D.N.Y. 2011) (internal quotation marks omitted). Specific facts as to First Brands Group's device use policy are, at this point in the time, within the custody or control of First Brands Group and/or the government. In any event, Mr. James does assert that he had a reasonable expectation of privacy in his Microsoft and iCloud accounts—both of which were assigned to him. Indeed, courts in this Circuit have suppressed electronic evidence seized from business premises and corporate email accounts. *See, e.g.*, *United States v. Wey*, 256 F. Supp. 3d 355, 379 n.4, 410–11 (S.D.N.Y. 2017) (suppressing electronic data and hard drives obtained from execution of search warrant at the offices of a company of which the defendant was

the founder and principal executive); *United States v. Metter*, 860 F. Supp. 2d 205, 216 (E.D.N.Y. 2012) (suppressing electronic data seized from computer hard drives during a search of the defendant's office).

The government's claim that Mr. James does not have standing to challenge a search of his *personal* iCloud account is extraordinarily aggressive overreach. The government's contention that this account was an "extension of his FBG work environment"—based on the claim that it is "his tied to his FBG-issued work cellphone and email address, used for business communications, and backed up automatically to Apple's servers with no evidence that he maintained control over, restricted access to, or otherwise treated the account as a private repository," Opp. at 91—completely ignores or misstates obvious facts about Mr. James's iCloud account.

Mr. James is the individual customer associated with the iCloud account at issue, with the account subscribed under the name "Ed James." Dkt. No. 123–2, Ex. B ¶ 2(c). Additional Apple iCloud account details establish that Mr. James created the Apple ID and iCloud accounts at issue in *2007* and *2011*, respectively, years before the founding of First Brands Group, and that Mr. James activated the "Apple Private Email Relay" function which, according to Apple, is a manual feature that iCloud subscribers can activate to help ensure that their "personal email address remains private."[4] *See* Ex. C, SDNY_JAMES_00035020. Mr. James's creation of his iCloud account for his own use, the personal use of his iCloud account for many years prior to his employment at First Brands Group, and his manual activation of additional privacy features on the account support an inference that he maintained his personal iCloud account for his individual use and reasonably expected its contents to remain private. Mr. James's use of his personal iCloud account for occasional business communications, evidenced in the Apple Affidavit by a single

---

[4] *Create Unique, Random Email Addresses with Hide My Email and iCloud+*, Apple Support, https://support.apple.com/guide/icloud/what-you-can-do-with-icloud-and-hide-my-email-mme38e1602db/icloud

business-related text message sent by Mr. James (Dkt. No. 123–2, Ex. B ¶ 24(b)(vii)), does not by itself extinguish that expectation. *See United States v. Cioffi*, 668 F. Supp. 2d 385, 387–90 & n.7 (E.D.N.Y. 2009) (noting the defendant's undisputed reasonable expectation of privacy in a personal Gmail account that he also used for work-related communications).

Mr. James relies on this evidence to establish the privacy interests underlying his standing. A separate declaration is not an invariable prerequisite to that showing. *See United States v. Maher*, 120 F.4th 297, 309 n.10 (2d Cir. 2024) (rejecting the government's argument that a declaration attesting to the defendant's subjective expectation of privacy is necessary to assert standing).

### B. Evidence Obtained Under The Microsoft Warrant Should be Suppressed For Overbreadth And Lack Of Particularity

#### 1. The Microsoft Warrant's January 2020 Start Date Is Overbroad And Lacks Adequate Support In Probable Cause

In a post hoc attempt to conjure some basis for the seizure of contents from Mr. James's Microsoft account from the nineteen-month period between January 1, 2020 (the start date of the authorized search) and July 31, 2021 (the first dated act in the affidavit related to Mr. James), the government relies on a misconstrued account of the affiant's interview of a former First Brands Group employee. Opp. at 92. The former employee worked at First Brands Group between 2019 and 2022 and told the Microsoft Warrant affiant that Patrick James, Edward James, Andrew Brumbergs, Stephen Graham, and another First Brands Group employee "met every day" and the former employee "was present for some of the meetings" in which he witnessed misconduct by Patrick James; the former employee attributed no wrongdoing to Mr. James directly. Dkt. No. 123–1, Ex. A ¶¶ 27, 32–33. The affidavit does not provide any date range for these daily meetings or the former employee's attendance at "some" of them. *Id.*

The government's opposition posits a materially different account: that between 2019 and 2022, the witness *himself* "met 'every day'" with Patrick and Edward James, Brumbergs, and

Graham, thus establishing probable cause to seize Mr. James's Microsoft records extending "back to at least 2019", an even broader period than the warrant itself authorizes. Opp. at 92 (claiming that Mr. James "is wrong" that the earliest dated fact as to him is a July 31, 2021 email because "the Ohio Affidavit summarizes an interview of an FBG insider who worked at FBG from 2019 to 2022 and explained how he "met 'every day'" with Patrick James, Edward James, Andrew Brumbergs, and Stephen Graham"). The government's attempt to justify the January 2020 starting date rests on a sleight of hand: substituting the witness' years of employment for the dates of the alleged misconduct. In fact, the affidavit explicitly states that the former employee did *not* meet with this group "every day"—rather, the former employee attended only "some" of those meetings. Even assuming that attendance at such meetings is in some way a basis for probable cause, the affidavit is silent on how many meetings the former employee attended, when those meetings actually occurred, and on what dates the "shopping of the balance sheet" discussions took place. Thus, the affidavit still supplies no fact that would justify seizure or explain why Mr. James's account would contain evidence from January 2020. Indeed, the government's reliance on this one incredibly thin assertion—that has already crumbled under its own weight—indicates that no consideration was given at the time the affidavit was written to the timeframe justified by probable cause. Now the government is left to search for anything in the affidavit that it could use as a post hoc justification for seizure of Mr. James's records during this timeframe. But even that effort has come up short.

The government points to a strawman in its claim that "the Government is unaware of any authority—and the defendant cites none—even requiring a temporal range." Opp. at 92. The defense argument is not about a hypothetical requirement for a temporal range. Rather, the defense argument is that in this case, on the basis of the facts set forth in this affidavit, the temporal range

for seizure was not supported by probable cause, and that that warrants suppression of the overbroad portions of the warrant. On this point, there is clear authority in the defendant's favor. For example, *Abboud* rejected as overbroad a warrant that permitted law enforcement to "rummage[e]" through a defendant's records during a date range that exceeded the period supported by probable cause. *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006). "Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad." *Id.* The government's reliance on *Martin* does not resolve this deficiency. Opp. at 93 (citing *United States v. Martin*, 426 F.3d 83, 86 (2d Cir. 2005)) ("holding it untenable to conclude that property may not be searched unless its occupant is reasonably suspected of a crime and is subject to arrest"). Mr. James does not contend that a search requires probable cause to arrest the account holder. The relevant inquiry here is whether the affidavit establishes a fair probability that evidence of the identified offenses will be found in the account during the authorized period. Here, it does not.

### 2. The Microsoft Warrant's Generic List Of Items To Be Seized Does Not Supply The Required Particularity

Independent of its temporal overbreadth, the Microsoft Warrant fails to provide sufficient guidance to the executing agent who must sort responsive records from ordinary business materials. The warrant authorizes the seizure of evidence of fraud and money laundering involving a group of "Relevant Entities" which includes "identified or unidentified co-conspirators." Dkt. No. 123–4, Ex. D § II. The warrant then authorizes the seizure of broad categories of business, personnel, accounting, lending, asset, and expenditure records related to these uncabined "Relevant Entities." *Id.* at II(a)–(j).

The argument here is not that executing agents may exercise no discretion, *see* Opp. at 94, but rather that the Fourth Amendment requires a warrant to provide sufficient guidance for the

exercise of that discretion. *See United States v. Vilar*, 2007 WL 1075041, at *23 (S.D.N.Y. Apr. 4, 2007) (finding insufficiently particular a "catch-all" provision authorizing seizure of all corporate records because "nowhere is this catch-all provision in any way circumscribed").

The complexity of this case may permit broader descriptive categories, but that is not the issue Mr. James is highlighting. The question is, how can a law enforcement agent execute a warrant that, for example, relies on a definition of "Relevant Entities" that includes unknown entities? The agent cannot. Digital searches are subject to "heightened sensitivity to the particularity requirement" because "advances in technology and the centrality of computers in the lives of average people have rendered the computer […] akin to a residence in terms of the scope and quantity of private information it may contain" and "the potential for privacy violations occasioned by an unbridled, exploratory search of a [digital device] is enormous." *United States v. Galpin*, 720 F.3d 436, 446–47 (2d Cir. 2013) (distinguishing digital searches from physical searches in which objects naturally limit where officers may look when conducting a search). The Microsoft Warrant's categories of items to be seized must be assessed against the constitutional principle that the authorization remain tied to its factual justification. Here, it is not.

### C. The Apple Warrant is Overbroad Because Its Authorized Search Of Intimate Personal Data Exceeds The Affidavit's Text Message Showing

The Apple Affidavit's concrete examples attempting to tie Mr. James's personal iCloud account to the Subject Offenses are five text messages: four received by his phone and one sent from it. Dkt. No. 123–2, Ex. B ¶ 24(b)(v)–(ix). Yet the Warrant demands production of sensitive personal records far beyond text messages, including "[a]ll photographs or videos" associated with the account, "[a]ll location data," and "[a]ll documents stored in or otherwise associated with" it, without offering any case-specific fact related to Mr. James with respect to those repositories of personal data. Dkt. No. 123–9, Ex. I at Attachment A § II(a)–(m).

The government's distinction between provider disclosure and ultimate seizure does not resolve the issue. Opp. at 94–95. Limiting the evidence ultimately seized to the Subject Offenses does not explain why the additional categories of sensitive data—for which the affidavit offers no evidence to establish probable cause—should be searched in the first place. The affiant invokes boilerplate "training and experience" bases to suggest that screenshots may preserve Signal messages, calendars and photographs may establish meetings or shared locations, and Notes or iCloud Drive may contain fraud-related documents. Dkt. No. 123–2, Ex. B ¶¶ 24(e)–(f), 25. But those general possibilities and inferences do not identify a single specific fact connecting Mr. James's use of personal features beyond text messaging to the alleged offenses, nor does the affidavit speak to the broader examination of videos, unrelated photographs, and documents stored on Mr. James's personal iCloud account. *See United States v. Bermudez*, 526 F.2d 89, 96–97 (2d Cir. 1975) (concluding that the district court had properly held a warrant to search an entire building invalid on overbreadth grounds where probable cause existed only with respect to specific floors).

### D. The Government Has Not Established Timely And Reasonable Execution of the Microsoft And Apple Searches

The government's opposition offers for the first time a timeline, albeit incomplete, of its execution of the warrants at issue. Microsoft produced records to the Northern District of Ohio in June 2025; an Ohio privilege screen followed; SDNY assumed the investigation around November; and Apple produced records that November. The government contends that it completed its responsiveness review of records not withheld as potentially privileged before producing the Microsoft materials on April 27, 2026 and May 12, 2026, and the iCloud materials on May 12, 2026. It further states that additional records previously withheld for privilege review were released to prosecutors on or about August 25, 2026, and that it reviewed those records and

produced the responsive materials on October 5, 2026. Opp. at 77–79. But that chronology does not identify when substantive review of the Microsoft account began or the work performed during the Ohio period. Privilege screens and production dates do not establish when substantive review occurred. It is possible that no one began reviewing the search warrant data for many months, in effect, "sitting" on the data, rather than reviewing in a diligent way. The government has refused to provide information to the defense that would allow it and the Court to actually assess the reasonableness of the review. The Court should require it to do so.

The government's characterization of Mr. James's privilege assertions as "wide-ranging" is unavailing. Edward's claims were limited to a small subset of documents (fewer than 400 documents across both Warrants). Dkt. No. 122 at 14. The government's opposition principally describes Patrick's and First Brands Group's privilege claims, asserting that Patrick's "voluminous" claims reached Edward's accounts. Opp. at 97. It does not identify the affected portions of Edward's accounts or explain why review of the remainder was delayed.

An unresolved privilege subset also does not itself justify reopening previously completed responsiveness review of the nonprivileged corpus. After the government's asserted April–May 2026 completion of its review of records not withheld from the prosecution team as potentially privileged, its September 3, 2026 letter maintained that all reviews remained open and the government could search "the entirety of each search warrant return[.]" Dkt. No. 123–8, Ex. H at 1–2. The government now for the first time describes accessible-material review as complete, subject to filter releases. Opp. at 79. The government must identify whether its later searches examined new releases or revisited material already reviewed.

*Nejad* distinguishes a supported initial review from searches conducted after it ended. *United States v. Nejad*, 436 F. Supp. 3d 707, 736–37 (S.D.N.Y. 2020) (finding that documents first

identified in subsequent searches "were seized outside the scope of the search warrants" and were therefore "subject to suppression" absent an applicable exception). *Metter* likewise requires the government to complete review "within a 'reasonable' period of time." *Metter*, 860 F. Supp. 2d at 215. At a minimum, the Court should require the government to provide a full review history for each account and separately released set of documents, including start and completion dates.

**E. The Exclusionary Rule Applies Because The Government Cannot Cure These Defects Merely By Invoking Good Faith**

Here, the exclusionary rule applies because the good-faith exception cannot cure the Microsoft and Apple Warrants' facial deficiencies that preclude objectively reasonable reliance. "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)). Although issuance of the warrant ordinarily supports that showing, *Leon* recognizes that a warrant may be "so facially deficient" that "the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). As set forth above, the Warrants' overbroad authorizations and their insufficient connection to the factual showing were apparent from the applications themselves. The argument is not that every probable cause defect requires exclusion. *See Clark*, 638 F.3d at 100; *United States v. Falso*, 544 F.3d 110, 128–29 (2d Cir. 2008). Rather, the extent of the deficiencies here rendered reliance unreasonable.

For the foregoing reasons, Mr. James respectfully requests suppression of the evidence obtained directly or derivatively from the invalid authorizations contained in the Microsoft and Apple Warrants.

## IV. Mr. James's Motion To Dismiss Should Be Granted

The government provides no good reason to deny Mr. James's motion to dismiss the Indictment. Instead, the Opposition rests largely on unremarkable and undisputed statements of the applicable law, while failing to address the actual bases for dismissal raised by Mr. James.

### A. Counts Three, Four, And Eight Should Be Dismissed As Impermissibly Multiplicitous Of Count Six

As described in Mr. James's opening brief, Counts Three, Four, and Eight, charging wire fraud, should be dismissed because they do not charge offenses distinct from Count Six, also charging wire fraud. Count Six alleges a fraud against First Brands' "lenders" involving First Brands' financial condition, while each of the other wire fraud counts simply target a narrower subset of the same alleged lenders and the same alleged misrepresentations concerning the company's financial condition.

The government's first two arguments in opposition rely on the propositions that the wire fraud statute "allows each wire to be charged separately" and that "the indictment describes four distinct schemes with different victims and different wire transmissions." Opp. at 54. But Mr. James does not dispute these points and acknowledged them in his opening brief. *See* MTD at 8 (recognizing that each use of the wires could constitute a separate crime); MTD at 4-5 (describing the four fraudulent schemes alleged in the indictment). The relevant question is not whether separate wire transmissions may support separate charges. It is whether these counts charge separate transmissions at all given that Count Six uses the broad term "lenders," while Counts Three, Four, and Eight merely identify subsets of that same group. The government's opposition leaves that question unanswered.

More specifically, Count Six broadly alleges that Mr. James devised a scheme to defraud First Brands' "lenders" and obtain money from them through fraudulent representations

concerning "First Brands' financial condition." Indictment ¶ 49. Counts Three, Four, and Eight merely contain the same allegation for subsets of the same "lenders"—First Brands' "factors," "supply chain financers," and "off-sheet lenders"—alleging that the company's "financial condition" was misrepresented. And as set forth in Mr. James's opening brief, the Indictment makes clear that "factors," "supply chain financers," and "off-sheet lenders" are each a type of First Brands' "lenders," and the purported misinformation conveyed as part of Counts Three, Four, and Eight all involve, just like Count Six, First Brands' "financial condition." *See* MTD at 9-10; *see also* Indictment ¶ 12 (treating "factors" as subset of "lenders"); ¶ 16 (describing "supply chain financers" as part of First Brands' "lenders"); ¶ 22 (defining "lenders" to include "off-sheet lenders"). Thus, even though the speaking portion of the Indictment describes different alleged schemes, and even though the government isn't precluded from charging multiple wire fraud counts, Counts Three, Four, and Eight do not charge any offenses that are distinct from Count Six.

The government elides this argument and points instead to the four separate schemes described by the Indictment to claim that the motion "fails as a matter of law" because Mr. James "does not dispute that the Government alleges more than four wires were used in furtherance of the wire fraud schemes." Opp. at 54. Mr. James concedes no such thing, and accepting the government's logic would mean that the same wire transmission could be charged as multiple separate crimes simply by describing the recipient differently in each count, such as a "factor" in one and a "lender" in another. That is precisely the kind of double-counting the multiplicity doctrine is meant to foreclose. *See United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999) (describing an indictment as multiplicitous "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed"). Moreover, if Counts Three, Four, Six and Eight truly rested on four discrete, nonoverlapping sets of wire

transmissions, the government could simply say so, and its failure to do so supports the strong inference that Count Six simply recombines, under a broader label, the very conduct and communications already charged in the other wire fraud counts.

In an effort to distinguish Count Six from the other wire fraud charges the government relies exclusively on paragraph 30 of the Indictment to support its claim that "[t]he speaking indictment makes clear" that Count VI "charges separate wires and applies to a different category of lenders than the accounts receivable factoring fraud, the accounts payable fraud, or the off-sheet lender alleged in Counts Three, Four, and Eight." Opp. at 55. But paragraph 30 does not provide any clarity. It is part of Count One (under which Mr. James is not charged) and says:

> ***False and Misleading Statements about First Brands' Financial Condition***
>
> 30. PATRICK JAMES and EDWARD JAMES, the defendants, also defrauded First Brands' lenders by disseminating materially false and misleading financial information about the company and secretly encumbering assets subject to the lenders' borrowing base and priority liens.

However, there is nothing in paragraph 30 or Count Six to suggest that Count Six is premised specifically on the allegations set forth in paragraph 30. Further, Count Six incorporates all the Indictment's preceding paragraphs—not merely paragraph 30—underscoring the fact that Count Six is not, as written, limited to any particular subset of First Brands' lenders. In other words, under the government's own logic, the "lenders" referenced in Count Six could just as easily be the "lenders" discussed in paragraph 30 as the "inventory financers" identified in paragraph 29.

Perhaps recognizing this, the government relies heavily on the use of the word "also" in paragraph 30—a word the government silently emphasizes in its brief without attribution as if that emphasis appears in the Indictment when it does not—to mean that paragraph 30 describes conduct that is somehow different than that alleged in Counts Three, Four and Eight. *See* Opp. at 55. But "also" does not mean the conduct described in paragraph 30 or Count Six is in any way different

than that alleged in Counts Three, Four, and Eight, particularly where the Indictment nowhere defines "lenders" in Count Six to exclude factors, supply chain financers, or off-sheet lenders. Further, the language of Count Six, which plainly refers broadly to First Brands' "lenders," simply cannot be squared with the government's post hoc effort to try to clarify the charges, which is impermissible in any event. *See Russell v. United States*, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure."); *United States v. Fried*, 450 F. Supp. 90, 94 (S.D.N.Y. 1978) (finding the government's explanations of what the indictment alleged insufficient to overcome charging deficiencies).

Finally, the government falls back on the argument that Mr. James's multiplicity argument is premature and should be decided only after trial. *See* Opp. at 56. However, even the authority upon which the government relies confirms that this issue must be raised now. *See United States v. Dumitru*, No. 18 Cr. 0243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. 2018) (confirming that Fed. R. Crim P. 12(b)(3) requires that a motion to dismiss on multiplicity grounds must be made before trial and that failure to do so results in waiver).

Regardless, none of the cases the government cites involve the circumstances present here, where an indictment charges the same crime, under the same statute, involving the same alleged victims and misrepresentations. Rather, in all but one of the cases cited by the government, the defendant sought to have charges brought under *different* statutes dismissed, arguing that identical facts could support a conviction for both. *See Dumitru*, 2018 WL 3407703, at *1 (18 U.S.C. § 1001 and 18 U.S.C. § 1546(a)); *United States v. Saab*, No. 19 Cr. 676 (PGG), 2021 WL 5868157, at *15 (S.D.N.Y. 2021) (same); *United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at

*9 (S.D.N.Y. 2020) ("Halkbank contends that Count Two (conspiracy to violate the IEEPA) and Count Six (conspiracy to commit money laundering) are multiplicitous because 'the government details the same scheme consisting of the same transfers of funds, from the same accounts, on the same dates as the basis for the two charges.'") (quoting defense motion). And, although *United States v. Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 1066804, at *2 (S.D.N.Y. 2012), involved two counts of securities fraud, the face of the indictment made clear that those counts were different, involving separate securities transactions made on the same day but in different amounts.[5]

Unlike in those cases, however, the government has crafted this Indictment in a way that specifically invites the jury to convict on all four of the wire fraud counts even if the government proves only a single fraudulent wire to First Brands' "lenders." And the availability of a post-verdict remedy does not answer the concern Mr. James raises about presenting these charges to the jury. His objection is not merely that the trial evidence might establish overlap among otherwise distinct offenses, as in the cases cited by the government. Rather, it is that Count Six encompasses the same alleged lenders and misrepresentations charged more specifically in Counts Three, Four, and Eight, without identifying a single distinct wire transmission that would allow the jury to distinguish the counts. This prejudice should be addressed now.

**B. Counts Two, Six, And Seven Should Be Dismissed For Lack Of Specificity**

The government fails to address Mr. James's argument that Counts Two, Six, and Seven improperly rely on broad, undefined categories of alleged victims and financial information—such as "lenders," "financers," "providers of asset-backed financing," "collateral," and "financial

[5] Although the charges are not detailed in Judge Rakoff's order, the Superseding Indictment reflects distinct transactions on the same day: one involving 150,000 shares of common stock (Count Three) and one involving 67,200 shares (Count Four). *See United States v. Gupta*, No. 11 Cr. 907, Dkt. No. 25 (Superseding Indictment dated January 31, 2012).

condition"—without providing any explanation whatsoever as to which counterparties, property, or alleged misrepresentations correspond to each charge.

Instead, the government relies on its standard argument that the Indictment meets the Rule 7 standard because it "tracks the statutory elements of each charged offense" and, presumably referring to the speaking portion of the Indictment, because it "describes the mechanics of each scheme in detail." Opp. at 58.

But again, the government misses the point and does not explain which counterparties or alleged misrepresentations correspond to each count. It fails to address, for example, that Count Two refers ambiguously to a fraud on First Brands' "lenders and financers," without any indication of whether those terms include accounts-receivable factors, supply-chain financers, off-sheet lenders, or some other financing counterparties referenced elsewhere in the Indictment. *See* Indictment ¶ 40. Nor does the government confront the fact that the bank fraud object in Count Two is equally vague, referring to "collateral that First Brands pledged or sold," without saying what property—or even what category of property—was involved. *Id.*

Likewise as to Count Six, alleging a scheme to defraud First Brands' "lenders" about the company's "financial condition," the government provides no indicia as to which lenders were involved or the nature of the alleged representations. ¶ 49. The government also ignores that Count Seven vaguely alleges fraud against "financial institutions that provided asset-backed financing." Indictment ¶ 51. But all of First Brand Group's borrowing was "asset-backed" and Count Seven does not identify whether that phrase refers to asset-based lenders, off-sheet lenders, factors, supply-chain financers, or some combination of those counterparties referred to elsewhere in the Indictment.

The government points to its "voluminous text searchable discovery" and other pretrial disclosures but does not explain how that information—even if it could cure a defective indictment—resolves these ambiguities. *See* Opp. at 58-59.

Finally, while the government claims that Mr. James has not identified any prejudice, his opening brief made clear that this lack of specificity—where the Indictment omits essential facts—leaves Mr. James unable to determine what conduct the government contends was criminal or prepare his defense. *See*, *e.g.*, *Russell*, 369 U.S. at 765 ("An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute.") (citation omitted); *United States v. Gruttadauria*, 439 F. Supp. 2d 240, 245 (E.D.N.Y. 2006) ("The indictment must be specific enough to permit a defendant to prepare a defense, thereby conforming to the Sixth Amendment's requirement that a defendant 'be informed of the nature and cause of the accusation.'") (quoting U.S. Const. Amend. VI).

**C. The Government Has Inadequately Alleged Venue**

The government not surprisingly gives little attention to Mr. James's venue arguments, claiming that the Indictment's repeated boilerplate that the alleged conduct occurred "in the Southern District of New York and elsewhere" is enough. *See* Opp. at 60; Indictment ¶¶ 39, 43.

Yet the government disregards the fact that Mr. James is a decades-long resident of Ohio, that First Brands was located in Cleveland without any corporate presence in New York, that there are no allegations about victims, overt acts, or banking activity in New York, and that there is nothing in the Indictment that would allow the Court to determine where any of the charged conduct occurred. Instead, the government offers merely that "[v]enue in cases involving continuing offenses . . . may lie in any district in which part of the offense was begun, continued, or completed." Opp. at 61. However, the government's failure to say (beyond boilerplate) where

any of the charged offenses were "begun, continued, or completed" is telling, and casts serious doubt on whether venue lies in this District. Underscoring this, the government acknowledges that it previously refused, in response to a request from the defense, to identify even an example in its voluminous discovery of facts that would support venue. *See* MTD at 17. Thus, where the Indictment provides no more than boilerplate, and where the government has steadfastly declined to offer even an example of facts establishing venue, dismissal is warranted.

Alternatively, the government should be required to provide Mr. James a bill of particulars supporting its venue allegations.[6] *See*, *e.g.*, *United States v. Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018, at *6 (S.D.N.Y. July 13, 2001) (ordering the government to provide "a bill of particulars describing facts it intends to establish at trial which it claims are sufficient to establish venue").

## CONCLUSION

For the reasons set forth above, Edward James respectfully requests that the Court grant the motion to sever (Dkt. No. 111), the motion to compel production and preclude the introduction of untimely disclosed evidence (Dkt. No. 118), the motion to suppress (Dkt. No. 122), and the motion to dismiss (Dkt. No. 114).

---

[6] In response to Mr. James's alternative request for a bill of particulars, the government provides no reasoned opposition other than that he "did not include this request in [his] initial motion for a bill of particulars and . . . provides no reason for this belated request or why it was not included initially." Opp. at 61. However, Mr. James's original motion for a bill of particulars remains pending, and there is nothing in Rule 7(f) that limits a defendant to a single motion or provides that omitting a request from one motion forfeits the right to seek additional particulars via a later motion. *See United States v. Calhelha*, 456 F. Supp. 2d 350, 366 (D. Conn. 2006) (considering successive motion for bill of particulars).

Dated: New York, New York
November 2, 2026

Respectfully submitted,

BRACEWELL LLP

By: */s/ Seth D. DuCharme*

Seth D. DuCharme
Nicole Boeckmann
Dina McLeod (*pro hac vice*)
David A. Shargel
31 West 52nd Street, 19th Floor
New York, New York 10019
(212) 508-6100
seth.ducharme@bracewell.com
nicole.boeckmann@bracewell.com
dina.mcleod@bracewell.com
david.shargel@bracewell.com