**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK JAMES and EDWARD JAMES,<br><br>Defendants. | Case No.: 1:26-CR-29 (VEC) |

**DEFENDANT EDWARD JAMES'S**
**MOTION TO CONDUCT RULE 15 DEPOSITIONS**

BRACEWELL LLP
31 West 52nd Street
Suite 1900
New York, New York 10019
(212) 508-6100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............ II

BACKGROUND ............ 1

LEGAL STANDARD ............ 4

ARGUMENT ............ 6

I. The Prospective Witnesses Are Unavailable ............ 6

II. The Testimony Is Material ............ 6

III. The Testimony Is Necessary To Prevent A Failure Of Justice ............ 13

CONCLUSION ............ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Ahmed*,
No. 12 Cr. 661 (SLT) (E.D.N.Y. Dec. 30, 2014), Dkt. No. 106 ....................4

*United States v. Al Fawwaz*,
No. 98 Cr. 1023 (LAK), 2014 WL 627083 (S.D.N.Y. Feb. 18, 2014) ....................5

*United States v. Alexandre*,
No. 22 Cr. 326 (JPC), 2022 WL 9843495 (S.D.N.Y. Oct. 17, 2022) ....................5, 12

*United States v. Bronston*,
321 F. Supp. 1269 (S.D.N.Y. 1971) ....................4

*United States v. Buck*,
271 F. Supp. 3d 619 (S.D.N.Y. 2017) ....................5

*United States v. Cohen*,
260 F.3d 68 (2d Cir. 2001) ....................4

*United States v. Epskamp*,
No. 12 Cr. 120 (RJS), 2013 WL 12175097 (S.D.N.Y. Oct. 3, 2013) ....................14

*United States v. Grossman*,
No. 03 Cr. 1156 (SHS), 2005 WL 486735 (S.D.N.Y. Mar. 2, 2005) ....................6

*United States v. Htut*,
No. 22 Cr. 671 (NSR), 2023 WL 3222484 (S.D.N.Y. May 3, 2023) ....................4

*United States v. Johnpoll*,
739 F.2d 702 (2d Cir. 1984) ....................5

*United States v. Korolkov*,
870 F. Supp. 60 (S.D.N.Y. 1994) ....................4

*United States v. Kostin*,
No. 24 Cr. 91 (GHW), 2025 WL 269059 (S.D.N.Y. Jan. 17, 2025) ....................5, 6

*United States v. Little*,
No. 12 Cr. 00647 (ALC), 2014 WL 3604417 (S.D.N.Y. July 16, 2014) ....................14

*United States v. Mohamed*,
No. 18 Cr. 603 (ARR), 2020 WL 1545522 (E.D.N.Y. Apr. 1, 2020) ....................5, 14

*United States v. Shestakov*,
No. 23 Cr. 16 (JHR) (S.D.N.Y. Jan. 6, 2025), Dkt. No. 198 ....................................................4

*United States v. Sindona*,
636 F.2d 792 (2d Cir. 1980)..........................................................................................6

*United States v. Vilar*,
568 F. Supp. 2d 429 (S.D.N.Y. 2008)..............................................................4, 5, 6, 14

*United States v. Wey*,
No. 15 Cr. 611, 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)........................................5, 11, 13

**Statutes**

18 U.S.C. § 1343 .............................................................................................................1

18 U.S.C. § 1344 .............................................................................................................1

18 U.S.C. § 1349 .............................................................................................................1

18 U.S.C. § 1956(h) ........................................................................................................1

50 U.S.C. § 1701 et seq...................................................................................................5

**Rules**

Fed. R. Crim. P. 15 ........................................................................................1, 4, 5, 6, 14, 15

Pursuant to Federal Rule of Criminal Procedure 15, Defendant Edward James ("Mr. James") respectfully submits this motion to conduct the depositions of witnesses located abroad. Specifically, Mr. James seeks to depose two prospective witnesses located in Mexico and five prospective witnesses in Romania. The prospective witnesses are all unavailable and possess anticipated testimony that is material to Mr. James's defense and necessary to prevent a failure of justice.

## BACKGROUND

The Indictment charges Mr. James with multiple counts of fraud and conspiracy offenses arising from First Brands Group's ("FBG" or "First Brands") complex financing arrangements. The charges against Mr. James include: (1) conspiracy to commit wire fraud affecting a financial institution and bank fraud in violation of 18 U.S.C. § 1349 (Count Two); (2) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343 (Counts Three, Four, Six, and Eight); (3) bank fraud, in violation of 18 U.S.C. § 1344 (Counts Five and Seven); and (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine).

The Indictment alleges that from approximately 2018 through 2025, Mr. James, his brother Patrick James ("Patrick"), and unnamed co-conspirators participated in multiple schemes to defraud First Brands' lenders and financers. The government has since identified two of the alleged co-conspirators as First Brands' Chief Financial Officer Stephen Graham and Vice President Andy Brumbergs. *See* Dkt. No. 103, Gov't Opp'n to Defs.' Motions for Bill of Particulars ("BOP Opp'n") at 3. Both Graham and Brumbergs are cooperating with the government and expected to testify at trial. The four separate alleged schemes involve: (i) accounts receivable ("AR") factoring, (ii) accounts payable ("AP") financing, (iii) off-balance sheet inventory financing through special purpose vehicles ("SPVs"), and (iv) false financial statements.

The alleged AR factoring fraud concerns First Brands' use of factoring, a financing arrangement in which First Brands would sell the invoices issued to its customers to a financer at a discount, in exchange for near-term cash. *See* Indictment ¶ 8. The government alleges that, as part of this scheme, "First Brands employees routinely submitted fake invoices, fraudulently inflated invoices, and double-pledged invoices for the purpose of selling and pledging them to factoring counterparties as if they represented valid, collectible receivables from customers." *Id.* ¶ 12.

The alleged accounts payable financing fraud concerns First Brands' use of supply-chain financing, an arrangement under which "financial institutions advanced funds against invoices First Brands owed to its suppliers." *Id.* ¶ 9. The Indictment alleges that these financers were defrauded when "First Brands submitted false and misleading invoice information and false and misleading information about First Brands' financial position to induce financers to increase the amount of funds advanced." *Id.* ¶ 16.

The off-balance sheet financing scheme involved arrangements between inventory financers (the "Off-Sheet Lenders") and entities owned and controlled by Patrick James (the "James Entities"). *See Id.* ¶¶ 21-22. Among other things, the Indictment alleges a fraud on the Off-Sheet Lenders through the James Entities pledging inventory that was purportedly unencumbered, but was in fact "already subject to liens by, or otherwise pledged to, First Brands' senior lenders and remained on First Brands' balance sheet." *Id.* ¶ 25. The Indictment alleges this scheme was furthered through the submission of "falsified inventory schedules and account documentation to the Off-Sheet Lenders." *Id.* The Indictment further alleges "extensive acts of concealment to disguise both the source of the proceeds obtained from the Off-Sheet Lenders and flowing into

First Brands and the repayment of obligations from First Brands to the Off-Sheet Lenders." *Id.* ¶ 26.

Lastly, the alleged false financial statement scheme concerns First Brands "disseminating materially false and misleading financial information about the company." *Id.* ¶ 30. The government alleges that "Patrick James, together with Graham and Brumbergs acting at his direction, manufactured and messaged quarterly financial metrics that did not reflect business reality but instead Patrick James's chosen result." BOP Opp'n at 6. As alleged in the Indictment, "[t]o implement [Patrick's] directives, First Brands employees maintained internal 'bridge' files that juxtaposed accurate corporate financials with spurious financial adjustments needed to meet the benchmarks set by PATRICK JAMES," with the "bridge files … then used to manually adjust entries in the corporate books of various First Brands' subsidiaries." Indictment ¶ 31.

As reflected above, the Indictment attributes much of the conduct at issue to "First Brands employees" and "First Brands" itself. The alleged AR factoring and accounts payable financing schemes involved "First Brands employees" submitting falsified invoices and spreadsheets, *see id.* ¶¶ 12, 17; the off-balance sheet scheme concerned Defendants allegedly "caus[ing]" fake inventory schedules to be provided, *id.* ¶ 25; and the false financial statements scheme alleges that "First Brands employees" made unsupported financial statement adjustments, *id.* ¶ 31. *See also* BOP Opp'n at 3 (asserting that Defendants relied upon Graham and Brumberg's "subordinates" "[t]o carry out the schemes").

Although First Brands was headquartered in Ohio, many employees with operational responsibility for the financing facilities and accounting processes at issue were located abroad, and in Romania and Mexico in particular. As Brumbergs summarized to a subordinate in November 2023 regarding relevant responsibilities, [redacted]

[redacted] Ex. A[1]; *see also* Ex. B (Brumbergs informing First Brands' Director of Accounting Nelly Luna, "[redacted]. Certain of the former First Brands employees located in Romania and Mexico are the subject of this motion.

**LEGAL STANDARD**

Rule 15 permits a party to seek the deposition of a "prospective witness" to preserve the witness's testimony for trial when "exceptional circumstances" exist and when doing so is "in the interest of justice." Fed. R. Crim. P. 15. Courts have frequently granted such requests. *See United States v. Ahmed,* No. 12 Cr. 661 (SLT) (E.D.N.Y. Dec. 30, 2014), Dkt. No. 106 (granting the government's motion to depose foreign witnesses in an undisclosed location abroad); *United States v. Shestakov*, No. 23 Cr. 16 (JHR) (S.D.N.Y. Jan. 6, 2025), Dkt. No. 198 (granting defendant's motion to depose a Russian witness abroad); *United States v. Htut,* No. 22 Cr. 671 (NSR), 2023 WL 3222484, at *2 (S.D.N.Y. May 3, 2023) (granting defendant's motion to depose two witnesses who resided in Myanmar); *United States v. Bronston*, 321 F. Supp. 1269, 1273 (S.D.N.Y. 1971) (granting permission for a defendant to take the Rule 15 depositions of several witnesses based in Spain).

In the Second Circuit, "exceptional circumstances" are established when a movant demonstrates that "(1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Vilar*, 568 F. Supp. 2d 429, 437 (S.D.N.Y. 2008) (quoting *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001)); *see also United States v. Korolkov*, 870 F. Supp. 60, 65 (S.D.N.Y. 1994) ("It is well-

---

[1] Exhibits cited herein are attached to the Declaration of Seth D. DuCharme, filed herewith ("DuCharme Decl."). Any document submitted with this motion bearing the Bates prefix "SDNY_JAMES" was produced to Defendants by the government.

settled that the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial.") (citing *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984)).

First, courts in this Circuit have found that "[u]navailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial." *Vilar*, 568 F. Supp. 2d at 437 (citing *Johnpoll*, 739 F.2d at 709). For example, in *United States v. Kostin*, a defendant charged with conspiracy to violate the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., sought and was granted permission to conduct the Rule 15 deposition of a Cyprus-based lawyer to testify regarding the defendant's lending activities and the lawyer's work related to relevant financial entities. No. 24 Cr. 91 (GHW), 2025 WL 269059, at *8-11 (S.D.N.Y. Jan. 17, 2025). As the court further articulated in *United States v. Mohamed*, "[f]oreign witnesses who are not subject to the government's subpoena power and, despite the moving party's appropriate efforts, refuse to travel to this country to testify are routinely found unavailable." No. 18 Cr. 603 (ARR), 2020 WL 1545522, at *2 (E.D.N.Y. Apr. 1, 2020) (quoting *United States v. Al Fawwaz*, No. 98 Cr. 1023 (LAK), 2014 WL 627083, at *1 (S.D.N.Y. Feb. 18, 2014)).

Second, prospective testimony is material when it is "highly relevant to a central issue in the case." *United States v. Wey,* No. 15 Cr. 611, 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017) (quoting *Vilar*, 568 F. Supp. 2d at 440). In the case of a defense motion, "it is sufficient that the testimony 'challenge central aspects of the government's allegations.'" *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2022 WL 9843495, at *2 (S.D.N.Y. Oct. 17, 2022) (quoting *United States v. Buck*, 271 F. Supp. 3d 619, 623 (S.D.N.Y. 2017)).

Finally, "[i]t is well-settled that a Rule 15 deposition 'is necessary to prevent a failure of justice' where the proposed witness is unavailable, her testimony is material, 'and there are no substantial countervailing factors militating against the taking of the deposition.'" *Vilar*, 568 F. Supp. 2d at 442 (quoting *United States v. Grossman,* No. 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005)). The prospective testimony Mr. James anticipates eliciting from the requested Rule 15 depositions satisfies all three elements.

**ARGUMENT**

Mr. James seeks to depose two prospective witnesses in Mexico: [redacted] and [redacted]. Mr. James also seeks to depose five prospective witnesses in Romania: [redacted], and [redacted]. The prospective witnesses are all unavailable and possess anticipated testimony that is material to Mr. James's defense and necessary to prevent a failure of justice.

## I. The Prospective Witnesses Are Unavailable

The prospective witnesses have all indicated to representatives of defense counsel that they cannot, or will not, voluntarily travel to New York to participate as witnesses at trial. *See* DuCharme Decl. ¶ 4. As foreign nationals, the prospective witnesses are not subject to the subpoena power of this Court. *See Kostin*, 2025 WL 269059, at *8. The prospective witnesses' unwillingness or inability to travel, and their location outside the reach of this Court's subpoena power, satisfy the unavailability requirement of Rule 15. *Grossman*, 2005 WL 486735, at *3 ("Courts may accept the assertions of counsel on the facts relating to unavailability ....") (citing *United States v. Sindona*, 636 F.2d 792, 803-04 (2d Cir. 1980)).

## II. The Testimony Is Material

The prospective witnesses held positions in First Brands' treasury and accounting departments during the relevant time period and, if deposed, are expected to testify to the

mechanics of the financing and accounting processes that are at the heart of the charged conduct alleged in the Indictment. These witnesses, located in Romania and Mexico, and their expected testimony about how those operations functioned—and at whose direction—are highly material to challenging key aspects of the allegations against Mr. James.

The significance of First Brands' Romanian and Mexican personnel is reflected in the work of the independent bankruptcy examiner appointed by the United States Trustee in First Brands' Chapter 11 bankruptcy (the "Examiner"). Within a week of his appointment, the Examiner and his team conducted site visits at First Brands locations in Romania and Mexico to collect evidence and interview witnesses. *See* Ex. C (Examiner's Work Plan) at 5. Throughout his investigation, the Examiner conducted regular update calls with the United States Attorney's Office and the FBI, *see* Ex. D (Examiner's Report) at 19, and the government has referred Defendants to the Examiner's report as a source of "evidence" concerning "First Brands' factoring programs and off-balance sheet transactions." BOP Opp'n at 103 (citations omitted).

Personnel at FBG's shared service center in Romania largely administered the process by which customer invoice information was consolidated and submitted to the factors, *see* Ex. D at 63, while the preparation of the company's consolidated financial statements was centralized in Mexico, *id.* at 61. Among other things, the prospective witnesses in Romania are expected to testify regarding the process by which First Brands submitted customer invoices to the factors, and from whom they received direction. The proposed witnesses in Mexico are expected to testify as to the financial reporting structure and the process through which First Brands prepared its consolidated financial statements underlying the alleged false financials scheme. Many of the proposed witnesses reported, directly or indirectly, to Andy Brumbergs, and if deposed, they are expected to testify that they did not know Mr. James and did not observe any conduct by Mr. James in

furtherance of the alleged schemes. The Indictment largely concerns actions taken by First Brands employees allegedly at Defendants' direction. *See, e.g.*, Indictment ¶¶ 12, 16, 25. Testimony from employees who exercised operational responsibility over the financings and accounting processes at issue, and who received no direction from Mr. James, and in many cases had never heard of him, is exculpatory and highly material to rebutting central aspects of the government's case. Information as to the relevance of each former employee is set forth below.

[redacted], formerly a Finance Analyst at FBG's Romania office, was directly involved in preparing the "nomination files" that First Brands submitted to the factors, identifying the customer invoices that First Brands was proposing to sell. [redacted] reported directly to Brumbergs and worked with others in FBG's finance department. As described in the Examiner's report, [redacted] explained to the Examiner that he "worked from system-generated, spreadsheet-level accounts-receivable reports … which were produced by FBG's reporting systems and provided to him for consolidation and nomination." Ex. D at 63. The "resulting nomination files were transmitted to Andy Brumbergs for further handling," before being submitted to the factors. *Id.* at 63-64; *see also id.* at 64 ("Multiple accounts corroborate a process in which invoice data was prepared and consolidated in Romania, but reviewed, adjusted, and authorized for submission by Cleveland-based personnel, principally Mr. Brumbergs, before being transmitted to Third-Party Factors.") (citing interviews of [redacted] and others).

Thus, the defense expects that [redacted] would testify about the process by which invoices were selected and submitted to the factors, a topic at the core of the alleged AR factoring scheme. *See* Indictment ¶ 12. [redacted] would also have information regarding which individuals within First Brands were involved in, or were directing, the nomination process. [redacted] is expected to testify that he communicated with Brumbergs frequently and had little knowledge of other First Brands

executives, including Mr. James. Moreover, [redacted] interacted with the factors directly and could provide information regarding those relationships. [redacted] anticipated testimony will thus elicit highly relevant information about First Brands' factoring practices, its relationships with its factors, and Mr. James's lack of involvement in the nomination process.

[redacted], a former Senior Financial Analyst at First Brands' Romania office, was heavily involved in tracking and reporting First Brands' inventory levels and values for accounting purposes and for use in First Brands' financing. From at least approximately mid-2022 to early 2024, [redacted] prepared inventory reports that were shared directly with Brumbergs and other senior First Brands executives. The alleged off-balance sheet financing scheme principally concerns representations regarding First Brands' inventory, *see id.* ¶ 25, placing [redacted] inventory reporting function at the center of the government's allegations. Her expected testimony regarding First Brands' processes for tracking and reporting inventory levels bears directly on the execution of the alleged off-balance sheet financing scheme.

[redacted] responsibilities extended to First Brands' accounts payable function, through which she supported First Brands' supply chain finance operations—for example, by investigating the underlying supplier invoices supporting certain supply-chain finance payments at the direction of personnel from company headquarters and coordinating payment to supply-chain financers.

[redacted] proximity to the practices at issue in the Indictment is underscored by her access to and participation in First Brands' Treasury SharePoint site, in which a limited number of employees stored and shared documents used to support the financing arrangements at issue. In his report, the Examiner specifically identified this SharePoint site as a significant source of financial records such as "receivable reports used in the [AR] factoring transactions, tracking spreadsheets, and documentation of factoring processes." Ex. D at 11; *see also id.* at 46-47. The

Examiner identified seven individuals as having access to the Treasury SharePoint, including [redacted], discussed below.

[redacted] is thus expected to testify about the processes underlying First Brands off-balance-sheet inventory financing and accounts payable financing. She would further have information regarding which individuals within First Brands were involved in, or were directing, First Brands' treasury function. And she is expected to testify that she had never heard of Mr. James.

[redacted], a former Finance Team Lead at First Brands' Romania office, assumed responsibility from [redacted] for preparing and circulating inventory reports to senior management in approximately early 2024. She was also directly involved in supporting First Brands' sale-leaseback transactions with Onset Financial, Inc., one of the "Off-Sheet Lenders," and repeatedly sent emails to and from the First Brands' email address *FBGOnset@firstbrandsgroup.com*. Thus, she would be able to testify about the inventory tracking and reporting underlying the alleged off-balance-sheet financing scheme, as well as First Brands' relationships with the Off-Sheet Lenders. She is expected to testify that she had email interaction with Mr. James, but that when it came to her responsibilities in connection with Onset, it was others who were responsible for approving transactions.

[redacted] is a former Senior Treasury Analyst at FBG's Romania office whose responsibilities included collecting, organizing, and updating monthly borrowing base materials, which she often provided to Brumbergs directly. She would therefore have information pertinent to the Indictment's allegations concerning the off-balance-sheet financing scheme, which is premised upon Defendants allegedly "secretly encumbering assets subject to [First Brands'] lenders' borrowing bases and priority liens." Indictment ¶ 30. Her responsibilities further included preparing reports regarding payments made to the factor Jefferies and forecasting available

capacity under the factoring facility. In this role, she communicated regularly with both Jefferies directly and accounting personnel at First Brands' headquarters. She would therefore also have information material to the alleged AR factoring scheme, in addition to information regarding which individuals within FBG were involved in, or were directing, the treasury function at FBG, including Brumbergs. She is expected to testify that she had never heard of Mr. James.

[redacted] was the Regional Director for First Brands' accounting department in the Europe, Middle East, and Africa region, whose responsibilities included regularly preparing and submitting accounts payable disbursement requests. These reports accounted for supply-chain finance program payments and were often submitted to Brumbergs directly. Her role in tracking and managing First Brands' accounts payable places her at the center of the supply-chain finance arrangements underlying the alleged accounts payable financing fraud. [redacted] was also responsible for preparing financial statements, reported to First Brands' head of accounting Nelly Luna, discussed further below, and would have information relevant and material to the alleged false financial statements scheme.

The Examiner's report repeatedly cites interviews with [redacted] and likewise relies on interviews with [redacted] and [redacted] *See* Ex. D at 16, 61-65, 67, 70-71, 73. [redacted] knowledge of First Brands' relationships with its factoring counterparties and its internal processes for nominating invoices to be sold to the factors is directly relevant to the conduct charged in the Indictment, thereby demonstrating materiality. *See Wey*, 2017 WL 237651, at *24. In addition, [redacted] [redacted] and [redacted] access to, and understanding of, First Brands' Treasury SharePoint site and the mechanics behind the financing facilities at issue in the Indictment provided them with highly material information concerning the alleged schemes. And each of prospective witnesses located in Romania played a critical operational role with respect to the treasury and accounting

functions underlying one or more of the schemes alleged in the Indictment. Moreover, their anticipated testimony about Mr. James's lack of involvement and the direction received instead from senior leaders like Brumbergs, is exculpatory and therefore "highly relevant" to challenge the allegations throughout the Indictment. *See Alexandre*, 2022 WL 9843495, at 4-5.

The testimony of the prospective witnesses in Mexico is equally material.

[redacted], former Director of Finance at FBG's Mexico office, performed account reconciliations and audit functions, reporting directly to Nelly Luna, First Brands' head of accounting. The Examiner's report states that "control over financial consolidation was concentrated in a narrow group," with "Luna, the global head of accounting located in Matamoros, Mexico, supervis[ing] the centralized consolidation process conducted in Mexico using HFM." Ex. D at 61. The Examiner's report included information about the Indictment's allegation that "employees maintained internal 'bridge' files that reconciled underlying financial data with adjustments needed to meet Patrick James' targets." *Id.* at 96. Relying on an interview with [redacted] the Examiner wrote that "[w]itnesses reported that, after determining the desired financial presentation, Mr. Brumbergs directed downstream personnel to record corresponding entries in subsidiary-level systems," with these directives often "communicated via spreadsheets." *Id.*

As reflected in the Examiner's report, [redacted] appears to have played an important role in this process. On July 12, 2024, for example, Luna sent an email to Brumbergs attaching a spreadsheet concerning the company's second quarter 2024 financials, stating, "[redacted]" Ex. E. The spreadsheet identifies the "[redacted]. Ex F. The same day Luna emailed the spreadsheet to [redacted] and others, stating, "[redacted]

[redacted]" Ex. G. Thus, [redacted] would have information bearing directly on the false financial statements scheme alleged in the Indictment. *See* Indictment ¶ 31. In addition to being able to testify to the financial adjustments at issue, [redacted] would have information regarding which individuals within First Brands were involved in, or were directing, the accounting group. [redacted] is expected to testify that it was Brumbergs who provided this direction, and he is further expected to testify that he had never heard of Mr. James until seeing media reports regarding this case.

[redacted], former Finance Manager at FBG. She reported to [redacted] including in connection with booking adjustments to the company's financials. [redacted] assisted in annual audits and was also involved in accounting functions that directly implicated the alleged AR factoring, AP financing, and inventory financing schemes. Her responsibilities included reconciling payments to factors and supply-chain financers to underlying customer invoices and supplier invoices. She also handled accounting for the transfers of funds to and from the Off-Sheet Lenders. She is also expected to testify that she did not know who Mr. James was.

If deposed, both [redacted] and [redacted] are expected to testify to their knowledge and understanding of First Brands' accounting process and to Mr. James's lack of involvement. The Indictment makes broad allegations of criminal conduct carried out at Mr. James's direction. The fact that individuals at First Brands with central roles in the accounting processes and financing practices at issue were unaware of Mr. James is exculpatory. Such information is therefore "highly relevant" to the charge that Mr. James directed alleged fraudulent activity. *Wey*, 2017 WL 237651, at *24.

## III. The Testimony Is Necessary To Prevent A Failure Of Justice

The proposed witnesses are unavailable as they reside outside of this Court's subpoena power and are unwilling or unable to testify at trial. Their roles within First Brands' finance and

accounting departments position them as well-equipped to testify to the mechanics of First Brands' factoring, financial statement consolidation, auditing, and other functions relevant to the alleged schemes. Further, all but one of the prospective witnesses are expected to testify that they had no knowledge of who Mr. James was. Such anticipated testimony is highly relevant to the alleged fraud schemes and to Mr. James's defense. Because the unavailability and materiality requirements of Rule 15 are satisfied, the Court's granting of the proposed foreign depositions is necessary to prevent a failure of justice. *See United States v. Epskamp,* No. 12 Cr. 120 (RJS), 2013 WL 12175097, at *2 (S.D.N.Y. Oct. 3, 2013) ("The 'failure of justice' element is met if the other two elements are met and there are no other countervailing factors.") (citing *Vilar*, 568 F. Supp. 2d at 442).

Further, whether the anticipated testimony will be admissible at trial is not a factor in deciding whether to grant a Rule 15 motion. *See Mohamed,* 2020 WL 1545522, at *2*; see also United States v. Little,* No. 12 Cr. 00647 (ALC), 2014 WL 3604417, at *2 (S.D.N.Y. July 16, 2014) ("[A party] can make the relevant objections at the deposition and object to the admissibility of such testimony at trial."). As set forth in Rule 15(f), "[a]n order authorizing a deposition to be taken under this rule does not determine its admissibility. A party may use all or part of a deposition as provided by the Federal Rules of Evidence." Fed. R. Crim. P. 15(f).

The charges against Mr. James carry significant sentencing exposure. If convicted, he could face decades in prison. Mr. James should be afforded the opportunity to mount a vigorous defense, including through Rule 15 testimony of foreign witnesses. The government is expected to rely heavily on the testimony of cooperating witnesses such as Brumbergs, who the defense expects to place blame on Mr. James. The prospective foreign witnesses' anticipated testimony cuts against the government's theory that Mr. James directed the alleged fraud schemes and can undermine the

likely testimony of government witnesses like Brumbergs. Mr. James has detailed the value of the prospective witnesses' testimony in this submission and respectfully submits that the Court should grant his request to depose witnesses with information material to his defense.

**CONCLUSION**

For the reasons set forth above, Mr. James respectfully requests that the Court grant his motion to conduct the depositions of witnesses located in Romania and Mexico pursuant to Federal Rule of Criminal Procedure 15.

Dated: New York, New York
November 9, 2026

Respectfully submitted,

BRACEWELL LLP

By: */s/ Seth D. DuCharme*

Seth D. DuCharme
Nicole Boeckmann
Dina McLeod (*pro hac vice*)
David A. Shargel
31 West 52nd Street, 19th Floor
New York, New York 10019
(212) 508-6100
seth.ducharme@bracewell.com
nicole.boeckmann@bracewell.com
dina.mcleod@bracewell.com
david.shargel@bracewell.com